# EXHIBIT B

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

```
                UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE


SAMANTHA COHODAS, an individual,      )
                                      )
                 Plaintiff,           )
                                      )
            vs.                       )  No. 2:22-cv-01561-RAJ
                                      )
THE CONTINENTAL INSURANCE COMPANY,    )
a foreign corporation,                )
                                      )
                 Defendant.           )
                                      )


          VIDEOCONFERENCE DEPOSITION OF JULIA MOLANDER


                    March 28, 2024




                 Taken Remotely Via Zoom
```

Reporter: Teri Simons, CCR, RMR, CRR

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 2..5

Page 2

```
 1                APPEARANCES
 2
     **ALL PARTIES APPEARING VIA ZOOM**
 3
 4      For the Plaintiff:
 5                Kari Lester
                  Geoff Bridgman
 6                Ogden Murphy Wallace
                  901 Fifth Avenue
 7                Suite 3500
                  Seattle, WA  98164
 8                206.447.7000
                  Klester@omwlaw.com
 9
10
11      For the Defendant:
12                Anthony A. Todaro
                  DLA Piper
13                701 Fifth Avenue
                  Suite 6900
14                Seattle, WA  98104-7029
                  206.839.4800
15                Anthony.todaro@dlapiper.com
16
17
18
19
20
        Also present:  Melaina Bell, CR shadow
21                Doreen Fadaiforghan
22
23
24
25
```

Page 3

```
 1              EXAMINATION INDEX
 2    EXAMINATION BY:                    PAGE NO.
 3    MR. BRIDGMAN                         4
 4
 5                EXHIBIT INDEX
 6    EXHIBIT NO.   DESCRIPTION          PAGE NO.
 7
 8  Exhibit No. 1   25-page report by Julia     6
                    Molander, dated 3/15/24.
 9
    Exhibit No. 2   33-page "Plaintiff's initial    17
10                  expert disclosure pursuant to
                    FRCP 26(a)(2)(B)."
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1    BE IT REMEMBERED that on Thursday,
2    March 28, 2024, at 9:02 a.m., before Terilynn Simons,
3    Certified Court Reporter, CCR, RMR, CRR, CLR, appeared
4    JULIA MOLANDER, the witness herein;
5        WHEREUPON, the following proceedings
6    were had, to wit:
7            <<<<<< >>>>>>
8    JULIA MOLANDER,     having been first duly sworn
9            by the Certified Court Reporter,
10           testified as follows:
11           EXAMINATION
12   BY MR. BRIDGMAN:
13 Q  Would you please state your name for the record?
14 A  **Julia Ann Molander, M-O-L-A-N-D-E-R.**
15 Q  And we met briefly.  I think I may have omitted to
16   actually doing the introduction.  My name is Geoff
17   Bridgman, and I am representing Samantha Cohodas here
18   today, and so I will be taking your deposition.
19       I am going to guess since you have a fair amount of
20   expert work, you have had your deposition taken on
21   multiple occasions?
22 A  **I have.**
23 Q  So you know all the rules.
24       If you don't understand the question, make sure you
25   ask me to clarify it, and let's not talk over each other,

Page 5

1    okay?
2 A  **I will try to observe both.**
3 Q  Okay.  And I will give you the last one, but I'm sure
4   you'll be good at it, and that is no "uh-huh" or "nuh-uh"
5   answers.
6       While I may understand it, it may not come through
7   on the transcript.
8 A  **Yes.**
9 Q  With those, let's get started.
10      Ms. Molander, I understand that you were retained by
11   Continental Insurance Company to provide expert opinions
12   in this matter; is that correct?
13 A  **I was retained by counsel for Continental.**
14 Q  And you prepared a report, correct?
15 A  **That's correct.**
16 Q  And the date on that report is March 15th, 2024?
17 A  **That is correct.**
18 Q  And Kari is going to go ahead and put that up.  We will
19   just make sure we have it identified, marked as an
20   exhibit, and then we'll move on.
21      While she is pulling that up, we have been
22   consecutively numbering exhibits.
23      For your deposition, we are starting over, so we are
24   not using the old numbers that we used with all the
25   Continental people, so this will be Exhibit No. 1, when

Page 6

1  Kari gets it up.
2    There it is.  It has been dumped in the chat.
3    If you can just pull that up and make sure to
4  identify if that is, in fact, your report.
5    Kari has it up.  Perfect.
6                (Exhibit No. 1 marked
7                for identification.)
8           THE WITNESS:  I can identify that as
9  my report.  That is it.
10 Q  (By Mr. Bridgman)  Okay.  Great.
11    Reading in the first paragraph of your report, it
12 indicates that you were retained to "Provide an expert
13 opinion regarding whether the Continental claims
14 handling, regarding the claim of Samantha Cohodas, meets
15 industry standards for underinsured motorist claims."
16    Did I read that correctly?
17 A  That's right.
18 Q  As part of your scope of representation, did that then
19 include identifying any failures as well as areas where
20 they did things correctly?
21 A  That's correct.
22 Q  Okay.  You have provided, as part of your report, a copy
23 of your CV.
24    Is that really your CV or is it just sort of
25 something from the internet?

Page 7

1    I am looking on Page 1 of Appendix A to your report.
2  A  That is really my CV.  It is not just something from the
3  internet.
4  Q  Okay.  So I would like to talk a little bit about your
5  employment history.
6    It looks like for a number of years you were an
7  active attorney from 1978 to 2019; is that correct?
8  A  That's correct.
9  Q  And during that time did you ever represent any of the
10 CNA insurance companies, including Continental Insurance
11 Company?
12 A  I have no recollection of doing so.
13 Q  Okay.  And during the time that you were an active
14 attorney from 1978 to 2019, did you ever represent an
15 insurer in Washington in a UIM claim, whether as coverage
16 counsel or defense counsel?
17 A  I have represented insurers in Washington, in particular
18 I represented Safeco from time to time, but it was
19 never-- I don't believe any of those were UIM claims.
20 Q  And then from 2019 you started your consulting business,
21 correct?
22 A  Correct.
23 Q  And since starting your consulting business, have you
24 ever been retained to testify regarding UIM claims
25 handling for any case?

Page 8

1  A  Yes.  I believe I was retained to handle a UIM case in
2  Idaho.
3  Q  Other than the one case in Idaho, have you been retained,
4  since 2019, as a consulting expert or as a testifying
5  expert regarding other UIM claims?
6  A  I don't recall.
7    There may have been one or two in which I was
8  consulted but never did any kind of testimony in terms of
9  that, but I honestly don't recall that.
10 Q  Have you done any consulting, since 2019, regarding UIM
11    extra-contractual claims in Washington?
12 A  Not that I recall.
13 Q  Since 2019 have you been retained to do any coverage
14    analysis for UIM claims in Washington?
15 A  No.
16 Q  Have you ever testified in a Washington court as an
17    expert?
18 A  No.
19 Q  So looking at your publications, and you are free to look
20 through the list you provided, I went through them, and I
21 didn't see that there were any publications that seemed
22 to address Washington law regarding UIM duties of
23 insurers.
24    Am I correct on that?
25 A  I don't believe there's anything in here that deals with

Page 9

1  that.
2    I do note that one of the issues that I addressed in
3  my discussions of driverless cars was, in fact, UM and
4  UIM liability because of the absence of a driver and
5  issues regarding that, so-- and one of the seminars I
6  gave on that issue was, in fact, in Washington.
7  Q  For the seminar that you gave in Washington on driverless
8  cars, did that seminar address the duties of good faith
9  claims handling by insurers to their insureds for UIM
10 cases?
11 A  It may have.
12    The issue there is whether or not there was a
13 driver, and therefore whether it came within the policy.
14    It was to the CPCU Society, so I anticipate that
15 there was some issue regarding claims handling, but I do
16 not recall for that date.
17 Q  Do any of the publications that you have identified
18 identify or address Washington law regarding-- let me
19 scratch that.
20    Do any of the publications that you identify,
21 identify or address Washington Administrative Code
22 provisions governing insurers doing business in the state
23 of Washington?
24 A  I do not remember.
25    The Washington code is very similar to the

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 10..13

Page 10

1   California code on the same subject, as well as the
2   National Association of Insurance Commissioners'
3   recommended regulations regarding that as well, but I
4   don't recall whether any of these specifically addressed
5   Washington UIM.
6       It's quite possible they touched upon that, but I
7   don't remember.
8  Q   Do any of the publications that you have identified in
9   your CV address duties of insurers under Washington's
10   Insurance Fair Conduct Act?
11 A   The Fair Conduct Act is-- builds upon the WAC in terms of
12   the regulations.
13      I may have touched upon it, but I am not certain
14   that I did at all.
15 Q   Do any of the publications that you identify in your CV
16   address Washington law under the Consumer Protection Act
17   for insurers?
18 A   The Consumer Protection Act is fair conduct and unfair
19   practices.  I may have touched upon it.
20      I'm not sure that I discussed it.
21 Q   And my internet broke up for just a second during your
22   answer, and I'm sorry, I am going to ask you to give me
23   that answer again.
24 A   Would it be a problem if the court reporter read it back?
25 Q   Not for me if it's okay with the court reporter.

Page 11

1                (Section(s) designated were
2                 read by the reporter.)
3  Q   (By Mr. Bridgman)  When you say the "Consumer Protection
4   Act is fair conduct," what do you mean by that?
5  A   It deals with unfair business practices in a general
6   sense, so by "fair conduct," it is whatever conduct might
7   be unfair, so the counterpart of it is fair conduct.
8       It specifically does not deal with fair conduct as
9   it is.  The IFCA does.
10 Q   So your report identifies documents that you reviewed in
11   forming opinions.  It looks like they are primarily
12   discovery documents.
13      Is that fair?
14 A   It is fair, there are discovery documents within the
15   various documents that I looked over.
16      There also are, for example, pleadings.
17      There was also claims documents.
18      All of that should be included in the documents that
19   I reviewed.
20      I may add to that, that I've also reviewed, more
21   recently, the opinion of Mary Owen that was produced in
22   terms of this matter.
23 Q   This is horrible.  I lost internet at the exact time you
24   started your answer and managed to reconnect literally at
25   the exact moment that you were finishing your answer.

Page 12

1                MR. BRIDGMAN:  Madam Court Reporter, I
2   apologize, but would you mind just reading the answer
3   back?
4                (Section(s) designated were
5                 read by the reporter.)
6                MR. BRIDGMAN:  Thank you.
7  Q   (By Mr. Bridgman)  As part of your investigation for this
8   case, did you interview any of the people employed by the
9   Continental Insurance Company who were responsible for or
10   had anything to do with the claims handling?
11 A   I did not.
12 Q   As part of your investigation for this case, did you rely
13   upon any representations of counsel where counsel asked
14   you to assume certain facts to be true or not to be true?
15 A   I did not.
16 Q   So in your report, on Page 2, you say that you are
17   familiar with Washington regs-- regulations and statutes
18   regarding fair claims practices?
19 A   Correct, I am.
20 Q   How did you become familiar with these regulations and
21   statutes?
22 A   In several ways.
23      One is I have given a number of seminars internally
24   to insurance companies.  One of them was Safeco, so I
25   know that I am familiar with that, the regulations with

Page 13

1   respect to those discussions.
2       The second is that I have written about various
3   aspects of Washington law; for example, the issues
4   regarding attorneys as-- the Courts considering
5   attorneys, whether or not they might be claims adjusters,
6   so in that context as well.
7       Then, thirdly, I worked very closely with a number
8   of people in the Cozen office in Seattle on various
9   matters and also became aware of the Washington
10   regulations and the IFCA and CPA during that period of
11   time.
12 Q   Okay.  So you have given some presentations to Safeco.
13      When were those presentations given?
14 A   Before Safeco moved from Washington.
15      I am going to say it was 20 years ago.
16 Q   So that would have been before the enactment of IFCA,
17   correct?
18 A   Correct.
19 Q   And you've written about Washington law regarding
20   attorneys as claim adjusters.
21      What articles have you written on that topic that
22   relates specifically to Washington law?
23 A   This goes back to a series of decisions that were made in
24   Washington considering the activities of attorneys in
25   handling various matters, as more akin to claims

Page 14

1  adjusters than to attorney-type advice and consultation.
2      During the course of that I became very familiar
3  with the Washington regulations and looking at what the
4  conduct was and the issues regarding that.
5      I know that I certainly reviewed it, and I wrote
6  more than one article on that.
7  Q  Did you write any articles on attorneys acting as
8     adjusters or being found to have been acting as adjusters
9     for UIM cases in Washington?
10 A  I think you said have I read any articles.
11     I may have read articles, but I think you meant
12     written articles.
13     The answer is I don't recall whether I touched upon
14  UIM claims as part of my addressing the issues of
15  attorneys.
16     The articles were oriented towards first-party
17  claims, so it's quite possible that I did touch upon
18  that, but I don't recall.
19 Q  And then it sounds like during your time with Cozen, you
20     became familiar with IFCA and the CPA; is that correct?
21 A  As well as the WAC.  I already had seen that as well.
22 Q  Do you-- which statutes are you familiar with that govern
23     fair claims practices?
24 A  In Washington or elsewhere?
25 Q  In Washington.

Page 15

1  A  Okay.  Both the CPA and IFCA, in my estimation, build
2     upon the regulations contained in the WAC, and those
3     regulations are ones that are relatively standardized
4     through the National Association of Insurance
5     Commissioners and are very similar to the ones in
6     California.
7  Q  Do you agree then that the WACs, the Washington
8     Administrative Code provisions that you are referring to,
9     set the minimum standard when determining the standard of
10    care for insurers doing business in the state of
11    Washington?
12 A  They set a standard of care for insurers doing business
13    in Washington.
14 Q  What is the standard of care in the state of Washington
15    for insurers to respond to communications from their
16    insureds?
17 A  I would have to consult the statute in order to tell you
18    that.  Rather, I would have to-- I would have to consult
19    the code to tell you that.
20 Q  Okay.  You've read Ms. Owen's report?
21 A  I did.
22 Q  It cites a number of WAC provisions; does it not?
23 A  It cites-- it quotes a number of WAC provisions.
24     To the extent those provisions are quoted, that's
25     correct.

Page 16

1      In the content of her opinions though, she does not
2  correctly quote the WAC provisions.
3  Q  I am going to come back to your-- well, what does she
4     misquote in terms of a WAC provision?
5  A  There are several times within her opinion that she
6     expands upon it.
7      She correctly quotes WAC provisions on Pages 19 and
8  20 of her report, but, for example, in the-- on Page 24
9  of her report, regarding the provisions of Subsection 13
10  of what I'll call 330 of the WAC, unless you want me to
11  read the whole thing out--
12 Q  Don't read the whole thing out.  Just identify what she
13    misquoted.
14 A  Her statement says, "Prohibits failure to provide a
15    reasonable explanation factually or legally for the
16    valuation or denial of any claim."
17     Paragraph No. 13 does not talk about the valuation
18  of every claim, and I would disagree that it sets that
19  standard.
20 Q  Any other WAC provisions that you believe she miscited or
21    misquoted?
22 A  That's the one that stood out to me.
23     There may have been other ones, which I think she
24     may have misapplied or misquoted.
25     Okay.  And you'll be prepared to address those?

Page 17

1  A  Yes.
2  Q  Okay.  So which other ones do you think that she
3     misapplied or misquoted?
4  A  So if you don't mind, I will look at her report.
5  Q  Sure.
6          (Exhibit No. 2 marked
7           for identification.)
8          THE WITNESS:  And I don't believe we
9  have this yet as an exhibit, so I will just talk about it
10  in terms of the page number in the particular exhibit or
11  particular report.
12     She correctly quotes 360 on Page 18.
13     She incompletely quotes 370 on Page 19 in terms of
14  the obligation to investigate.  There's a little bit more
15  information there.
16     She correctly quotes 370 for the period of time.
17     The rest of the paragraph that-- in terms of
18  reasonable assistance to the insurer, is not completely
19  correct, as I recall.
20     She says, on Page 19, 330 provides 19 causes of
21  action.  That's not correct.  It's 19 different standards
22  that the insurance company should try to, as a matter of
23  practice, follow.
24     In terms of her actual conclusions on Page 21, she
25  says that CNA failed to implement reasonable standards

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                    Pages 18..21

Page 18

1  for investigation.  The application of that to what
2  occurred with respect to CNA I don't believe is correct
3  in terms of implementation of reasonable standards.
4       On Page 22, the paragraph in the middle that says
5  that CNA failed to respond to relevant communications--
6  by saying "CNA," I mean "Continental."
7       It quotes the Paragraph No. 2 and Paragraph No. 3,
8  but it leaves out some important information.
9       The--
10 Q  (By Mr. Bridgman)  So let's stop on that one.
11 A  Okay.
12 Q  What important information was left out on that?
13 A  I think that there was-- it's not complete in terms of
14  that.
15      The particular rule, I think, says that they must
16  report-- must act upon important-- the submission of
17  claims and also the importance of communications.
18      I am happy to pull up the actual WAC to confirm
19  that.
20 Q  So you think she just misquotes it or-- why don't you
21  pull it up and tell us what WAC provision you are looking
22  at.
23 A  Sure.  Okay.
24      The subsection of 330 says that an insurance company
25  may be engaged in fair-- the WAC 330 says that "The

Page 19

1  following are defined as unfair methods of competition
2  and unfair or deceptive acts or practices of the insurer
3  in the business of insurance."
4       Subparagraph No. 2 says, "Failing to acknowledge and
5  act reasonably promptly upon communications with respect
6  to claims arising under insurance policies."
7       So I was mistaken, that first part of it is correct.
8       Subparagraph No. 3 says "Failing to adopt and
9  implement reasonable standards for the prompt
10  investigation of claims arising out of insurance
11  policies."
12      Then there's 360, which she also is referring to.
13      360 addresses the standards for the insurer to
14  acknowledge pertinent communications, and it says, under
15  Subsection 1-- it gives ten working days after receiving
16  notification of a claim as the date that the insurer must
17  acknowledge its receipt of the notice of the claim.
18      Subsection 2 says-- addresses the inquiry from the
19  commissioner.
20      Subsection 3 says, "For all other pertinent
21  communications from a claimant reasonably suggesting that
22  a response is expected, that the-- an appropriate reply
23  must be provided within ten working days for individual
24  insurance policies or 15 working days with respect to
25  communications in group insurance policies."

Page 20

1       The application of these was, I believe-- her
2  conclusion was that was repeatedly and consistently
3  failed to acknowledge, and I disagree with that, as in my
4  report I stated that from the inception of this claim,
5  which was reported first to Continental in May of 2015,
6  there was compliance with the communications requirements
7  and for almost six years.
8       It wasn't until the failure to communicate in April
9  of 2021, after the demand was sent by your office to
10  Continental, that there seemed to be a problem with the
11  compliance with the WAC requirements and the time period
12  in which you were supposed to respond, and that violated
13  both the WAC and also Continental's own internal
14  communications.
15 Q  Okay.  Are there any other WAC provisions that you think
16  Ms. Owen-- I appreciate that you have gone into some of
17  the analysis on it, but I'm more worried about any WAC
18  provisions where you think Ms. Owen misquoted the WAC.
19 A  No, I don't believe that she misquoted the WAC, except
20  for the one that I earlier stated in terms of the
21  valuation.
22 Q  And going back now to my outline, I had been asking you
23  if you could tell me what the WACs require for response
24  to communications from an insured.
25      You have now had a chance to review the WACs

Page 21

1  yourself.
2       Do you agree that the WACs require that insurers
3  respond to pertinent communications from their insureds
4  within ten days?
5 A  I do see that the WAC requires that insurers must respond
6  to important communications within either ten days or
7  15 days, depending upon whether-- and those are working
8  days, whether it's an individual policy or a group
9  policy.
10      The issue that I see from that is its response to
11  communications from its insureds, and there's always a
12  question of whether or not a communication from counsel
13  counts as a communication from the insured.
14      In this case all communications with Continental
15  were from counsel.
16 Q  Okay.  So you said there's an issue with that.
17      Is it your testimony that Continental did not have
18  an obligation to respond to communications that
19  Ms. Lester sent on behalf of Ms. Cohodas within ten days?
20 A  The answer is that the issue is a question as to whether
21  or not that ten- or 15-day period respond-- in terms of
22  the date of response, is from the claimant or it's from
23  the counsel.
24      I have not seen any cases dealing with the
25  difference between the two, but I do note that there

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                                    Pages 22..25

Page 22

1    were, particularly beginning in April of 2021, a failure
2    to respond to communications from counsel.
3    Q   Regardless of whether or not the communications came from
4        counsel or from Ms. Cohodas directly, what is the
5        standard of care-- I don't care about the WAC, other than
6        to the extent the WAC informs your opinion, but what is
7        the standard of care in terms of responding to
8        communications from or on behalf of an insured?
9    A   The standard of care, in general, is that the
10       communications should be timely; that is, the responses
11       should be timely.
12          It is the standards that Continental have set that
13       do require also that communications be timely.
14          Continental has various timelines by which
15       communications to-- regarding a claim, under the policy,
16       should be made, and certainly there were failures to
17       observe those time limits, beginning in April of 2021.
18   Q   What was Continental's policy regarding responding to
19       communications from an insured or from their counsel, in
20       terms of timing?
21   A   In terms of timing, it's that they respond promptly, and
22       that, according to the various claims manuals, the
23       general timing for the response was anywhere between ten
24       and 30 days, depending upon the particular communications
25       that were involved.

Page 23

1    Q   So what communications would allow Continental to respond
2        within 30 days?
3    A   I don't particularly recall which ones were within
4        30 days or not.
5           I think that the communications starting in April of
6        2021 did not comply with even a 30-day period of time of
7        response, as Continental would require.
8    Q   And the 30-day response is inconsistent with the WAC that
9        we just read, right, which says ten days or 15 days if
10       it's a group policy?
11   A   I am not in a position to judge whether or not that's
12       inconsistent or not.
13          That's a legal question, and I don't-- I am not
14       going to venture out on that.
15   Q   What is the standard of care for insurance companies
16       handling UIM cases in the state of Washington for
17       completing their investigation when they receive a demand
18       for benefits?
19   A   I will pull that up.
20          According to 370, it is that "Insurer must complete
21       its investigation within 30 days after notification of
22       claim, unless the investigation cannot reasonably be
23       completed within that time.  All persons involved in the
24       investigation of a claim must provide reasonable
25       assistance to the insurer in order to facilitate

Page 24

1        compliance with this provision."
2    Q   So 30 days to complete the investigation unless it can't
3        reasonably complete it earlier, correct?
4    A   That's correct.
5    Q   Did Continental complete its investigation within 30 days
6        of receiving the policy limits demand that was sent to it
7        on April 1st, 2021?
8    A   Continental attempted to complete its investigation
9        throughout the period of time between approximately March
10       of 2018, when your firm got involved, through the
11       conclusion of the case.
12          I note that there were at least six attempts to try
13       and get the most critical part of the investigation,
14       which is the medical records, because there was an issue
15       regarding the liability of the uninsured or underinsured
16       motorist.
17          There was an issue though as to the causation and as
18       to the type of medical condition that resulted from that
19       accident.  Those medical records were not provided in the
20       period of time between March of 2018 and up to April of
21       2021, despite requests that they do be provided.
22          In April of 2021 the records were, in fact,
23       provided.
24          Continental located and ultimately obtained an
25       expert, medical expert, to review those records and give

Page 25

1        an opinion regarding whether or not, in fact, the damages
2        that were claimed at that point in time by Ms. Cohodas
3        were a result of the accident, and more to the point,
4        could you separate out which damages or medical
5        conditions were the result of an accident or were the
6        result of prior conditions.
7           That investigation was not completed in 30 days.
8        There were issues regarding that completion, but
9        ultimately, in July of 2022, the doctor was obtained--
10       retained, I should say, and did give her opinion
11       regarding the condition of Ms. Cohodas and whether or not
12       it related to the accident that took place in April of
13       2015.
14   Q   And that's a long explanation, but I had asked a more
15       specific question.
16          I want to make sure I've got the short answer.
17          That is, Continental did not complete its
18       investigation within 30 days of receiving the demand for
19       policy limits that was sent to it on April 1st, 2021,
20       correct?
21   A   That is correct, it did not complete that until July of
22       2022, and there were various reasons for that.
23          There was the failure to acknowledge that from the
24       claims person, and there was the failure by counsel to
25       properly engage the already approved expert and to

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Page 26

1  provide that expert with medical records.
2  Q   Continental didn't even try and retain counsel for more
3      than 30 days after receipt of the demand, correct?
4  A   Continental retained counsel with respect to the
5      arbitration, and counsel was retained more than 30 days
6      after the demand was made, and that was with respect to
7      the demand for arbitration.
8          It was actually filed, I believe, one day after the
9      20-day time limit was given in the April 1, 2021 demand.
10 Q   And Continental didn't respond to the demand for
11     arbitration, did it?
12 A   There was no need for Continental to respond to the
13     demand for arbitration.
14         The demand for arbitration exists, and there's no
15     issue with respect to that demand.
16         This was made one day after the deadline that your
17     office set on the demand, and there is nothing in the
18     demand for arbitration that requires a response.
19 Q   What is the standard of care regarding compelling UIM
20     insureds to litigate?
21 A   The WAC addresses that, as does IFCA.
22         The WAC, on Subsection 7, says that unfair methods
23     of competition or unfair or deceptive acts or practices
24     of the insurer include, quote, "Compelling a first-party
25     claimant to initiate or submit to litigation,

Page 27

1  arbitration, or appraisal to recover amounts due under an
2  insurance policy"-- and then it goes on --"by offering
3  substantially less than the amounts ultimately recovered
4  in such actions or proceedings."
5      In my view, this section does not apply to this
6  particular case.
7  Q   Do you agree that offering zero is substantially less
8      than the million dollars that was eventually paid?
9  A   That's a very nice way of putting it, but, in fact, there
10     was no offering zero.
11         The issue was whether or not in response to the
12     demand made by the plaintiff there was any kind of
13     communication whatsoever, and there wasn't.
14         Ms. Davenport never communicated back on that
15     particular piece of correspondence, the demand, that is
16     dated April 1, 2021.
17         There is no question about that.  There is no
18     dispute about that.  She violated Continental policy in
19     failing to respond to that.
20         The day after the communication came-- the day after
21     the-- excuse me, I misspoke.
22         The day after the 20-day period to respond had
23     elapsed, your firm filed a notice of arbitration.
24         That was not compelled, in my view, by the failure
25     to respond to a settlement demand.

Page 28

1      A more reasonable approach would have been to engage
2  in a communication there, but the policy does say if
3  there's a difference of opinion regarding what is at
4  issue in the case, that it should be and must be sent to
5  arbitration, and so your firm immediately agreed and
6  decided to invoke that policy to demand an arbitration.
7      I don't agree with you that a zero offer is an
8  offer.
9      When you fail to communicate, that is not saying,
10 "We are not going to give you something," and, in fact,
11 Continental paid its full policy limits.
12 Q   So while there were a number of options available to
13     Ms. Lester, given Continental's failure to respond, the
14     demand said that "If you don't agree to pay, we will
15     initiate arbitration," correct?
16 A   Arbitration was initiated the day after the demand
17     expired.
18 Q   And Continental could have called and asked for
19     additional time, correct?
20 A   That's all speculation.
21         The fact of the matter is there was no response by
22     Ms. Davenport to this communication.
23 Q   What is the standard of care regarding providing the
24     basis in law and fact for decisions to pay or not pay
25     claims?

Page 29

1  A   The standard of care is set out in the WAC, and I believe
2      you are referring to Subsection No. 13, "Failing to
3      promptly provide a reasonable explanation of the basis in
4      the insurance policy in relation to the facts or
5      applicable law for the denial of claim or for the offer
6      of a compromised settlement."
7          In this situation we did not have either a denial of
8      the claim or an offer of a compromised settlement within
9      the 20-day period in which the claim-- rather, the demand
10     was made and the deadline set by your office to make a
11     response.
12         There is no question that there was a failure to
13     communicate back.  There was no response given to that
14     demand, but there was nothing that was done, so there was
15     not a failure to respond or to provide any kind of--
16     there was not, in the failure of response, any kind of
17     explanation because there just simply was no response.
18 Q   Do you agree with me--
19 A   And that's--
20 Q   Go ahead.
21 A   That absolutely violated Continental's policy.
22 Q   So what is Continental's policy, regardless of what the
23     standard of care is, for the timeline to complete
24     investigations?
25 A   Continental's policy, as I recall, and I may have it

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 30..33

Page 30

1  wrong, but I think I'm correct, is 30 days to complete an
2  investigation, unless there is some issue that causes you
3  not to be able to complete it, in which case you should
4  inform the insured of the reasons that you need
5  additional time in order to respond.
6  Q   What's Continental's policy, regardless what the standard
7     of care is, regarding compelling its insureds to file
8     suit or initiate arbitration in order to recover benefits
9     under UIM policies?
10 A   I don't understand your question as phrased.
11 Q   So we talked a moment ago about the standard of care.
12     You indicate that insurance companies should not
13     compel their insureds to submit to arbitration or
14     litigation, correct?
15 A   The standard of care, in terms of not requiring a
16     first-party claimant to initiate or submit to an
17     arbitration is contained in WAC 330 Subsection-- yes.
18 Q   And what is Continental's policy?
19 A   That particular subsection depends upon offering
20     substantially less than the amounts ultimately recovered
21     in such actions or proceedings.
22     Continental does not-- I believe its overall policy
23     is that you do not compel the insured to initiate any
24     kind of proceeding by offering substantially less than
25     the amounts recovered in the actions or proceedings, but

Page 31

1  that did not happen in this particular case.
2  Q   So you've got four main opinions; is that fair?
3     You sort of summarized them at the beginning of your
4     report, and then as you go through the report, you have
5     four sections that address them in more detail?
6  A   Correct.
7  Q   I would like to talk a bit about your first opinion.
8     Where would be the best place to look for the
9     synopsis opinion?
10     Would it be best to look at the first page of your
11     report where you sort of summarize them or would it be
12     best to look to the body of the report where you discuss
13     them?
14         MR. TODARO:  Object to form.
15         THE WITNESS:  It would be best to look
16     at the body of the report.  That's the actual opinions.
17 Q   (By Mr. Bridgman)  Okay.  So looking at Page 3 of your
18     report, the heading indicates, "Continental's claims
19     handling guidelines, training and administration met
20     insurance industry standards and Washington
21     requirements"?
22 A   That's correct.
23 Q   And we have addressed Continental's policy for responding
24     to its insureds, right?
25 A   We have addressed, in part, that policy with respect to

Page 32

1     responding to the insureds.
2  Q   Do we have anything else that we need to address that
3     bears on your opinion that Continental had good policies
4     regarding responding to its insureds?
5  A   Not unless you have particular questions for me.
6     I think my report fully states my opinion regarding
7     that.
8  Q   Well, your report doesn't indicate what timeframe
9     Continental's policies are for responding to
10     communications from insureds, correct?
11 A   It doesn't go into that kind of detail, but there are
12     timelines contained within the claims manuals that set
13     out Continental's policies for responding to insureds'
14     communications on important matters.
15 Q   And we have already affirmed that at least with regard to
16     the April 1st demand, Continental did not comply with
17     that policy, correct?
18 A   We have certainly found that Ms. Davenport, of
19     Continental, did not comply with Continental's own policy
20     in terms of responding.
21 Q   And then we've talked also about, but just making sure,
22     Continental has a policy regarding responding to demands,
23     and in your opinion, that's a good policy?
24 A   Continental has a policy with respect to responding to
25     demands.

Page 33

1     It has timelines in terms of what you do in terms of
2     demands.
3     Is that a good policy?  That's a very interesting
4     question.  I think it's a good policy.
5     In this situation we have a demand to pay policy
6     limits, and that demand would expire within 20 days.
7     In a UIM case, such a policy limits demand with a
8     time limitation on it is really not germane to a UIM
9     case.  It is much more akin to a third-party liability
10     case because the insurance company has an obligation to
11     pay its policy limits when it's determined, through a
12     reasonable investigation, that policy limits are payable.
13     The failure to respond to that demand did not
14     ultimately affect the payment of the full policy limits.
15     That is a separate and complete-- for example, in a
16     third-party policy case, if you give a $1 million demand,
17     and the insurance company fails to respond to that, then
18     you can pursue your own bad faith case with respect to
19     any excess judgment or verdict that might be the result
20     of that.
21     If the insurer does respond to it and says, "I will
22     pay this amount," and you agree to that, then you have a
23     settlement and you have no further liability.
24     In UIM cases it's different.  It's the policy limits
25     or whatever underneath the policy limits is the

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                                    Pages 34..37

Page 34

1    appropriate amount to pay.  It is not a situation where
2    you can say, "I will pay the policy limits, and I demand
3    you," being Continental-- "and I demand I get a full
4    release of all claims from the claimant."
5         In fact, in this case Continental never made that
6    kind of claim with respect to the payment of policy
7    limits.
8  Q   So let's unpack that a little bit.
9  A   Okay.
10 Q   When Continental is defending one of its insureds, and it
11     receives a policy limits demand, Continental has an
12     obligation to perhaps pay the policy limits, right?
13              MR. TODARO:  I will object to the
14     incomplete hypothetical--
15 Q   (By Mr. Bridgman)  I am trying to follow off of what you
16     said, right?
17     I believe what you were saying is that when an
18     insurance company, like Continental, is defending a claim
19     and receives a policy limits demand, it is important that
20     it respond promptly.
21     Is that part fair?
22              MR. TODARO:  Sorry, then I am going to
23     object.
24     I am going to ask, are we talking about defending a
25     third-party claim?

Page 35

1              MR. BRIDGMAN:  Yes, we are.
2              MR. TODARO:  Okay.
3              THE WITNESS:  And I understand what
4    you're saying, and the answer is that the consequences of
5    not responding to such a demand are such that the policy
6    might be opened up, which means that the insurance
7    company could be responsible for an excess verdict if it
8    fails to respond to a policy limits demand.
9  Q   (By Mr. Bridgman)  So on the one hand Continental, or any
10     insurance company, when they're defending a case, they
11     need to pay attention to that policy limits demand
12     because if it expires, they might be on the hook for the
13     excess, right?
14 A   That's-- you have essentially stated what I just said.
15 Q   And therefore the insurance company, in order to protect
16     itself, needs to pay heed to third-party policy limit
17     demands, otherwise they might lose their limits, right?
18 A   The insurer, to protect itself and its insured, because
19     its insured will be protected by virtue of responding to
20     that policy limits demand.
21 Q   Now, first party is different than third party, right?
22 A   Correct.
23 Q   The first party is a promise by the insurance company to
24     provide benefits to its insured if certain conditions are
25     met, correct?

Page 36

1  A   Correct.
2  Q   And I want to make sure that we are clear on the
3      implications of what you've said, and that is that when
4      an insured, who needs the benefits of the insurance,
5      makes a demand and says, "I am demanding that you give me
6      the benefit," is it your testimony that the insurance
7      company has no obligation to respond because the
8      insurance company is not potentially liable for an excess
9      judgment?
10 A   That's not what I said.
11 Q   That's the implication of what you said though.
12 A   You know, everybody has different implications of what is
13     said, but that's not what I said, nor was it the
14     implication of what I meant-- what I said in terms of
15     this.
16     What I'm saying is that a policy limits demand that
17     is time limited does not have the same effect in UIM
18     cases, so first-party cases, as it would in an excess
19     insurance case.
20     The time-limitedness of the demand is what I'm
21     particularly referring to.
22     If the insurance company has enough information at
23     the point that a demand for policy limits is made, that
24     fully satisfies the issues of whether or not the injuries
25     sustained in a UIM matter meet the policy limits, and

Page 37

1      that the causation, liability, and damages are such that,
2      in fact, the policy limits would be met, then there is an
3      obligation to respond to that policy limits demand with
4      the information noted.
5          It is my opinion that Continental did not receive
6      that information until October 7, 2022, and Continental
7      thereafter promised the policy limits within one week and
8      paid those policy limits within three weeks.
9  Q   But Continental didn't do any investigation whatsoever
10     into the demand for policy limits within 30 days, right?
11 A   Continental did not communicate at all within 30 days.
12 Q   Not only did they not communicate, but they didn't do any
13     investigation either within 30 days, correct?
14 A   Ms. Davenport did not respond in any way to that demand,
15     and she cannot say why she didn't respond to that demand
16     or why she didn't do anything with respect to the
17     response to the demand.
18 Q   And I've got it further in my outline, but you have said
19     this several times, and I want to make sure I am really
20     clear on this:
21     You talk about Continental receiving information
22     from its insureds to show a causation, right?
23     You are aware, aren't you, that Ms. Davenport never
24     even obtained, from the IT department at Continental, the
25     medical records?

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 38..41

Page 38

1  A  I am aware of that.
2     I am aware of various problems that she did in this
3  case, and they absolutely violate Continental's policies.
4  It is not appropriate claims handling standard by
5  Ms. Davenport for not obtaining those medical records,
6  for not doing an investigation, but if she had previously
7  tried to obtain the medical records, she was unsuccessful
8  in getting those.
9     Once she got them though in April of 2021, she did
10 not do anything with them, that is absolutely correct.
11 Q  And she didn't even give them to her defense counsel, did
12 she?
13 A  She-- defense counsel may have received them later on,
14 but it is not clear, in terms of that, but she did not--
15 she did not have a defense counsel at the time.  She did
16 retain a defense counsel in, I believe, August of 2021.
17    There is a question of whether or not defense
18 counsel received those records, but I know that later on
19 he obtained them directly from your office.
20            MR. TODARO:  Geoff, let me know when a
21 good time is for a break, at some point.  It doesn't need
22 to be now.
23            MR. BRIDGMAN:  Yeah, let me scroll
24 through and see how much longer I've got on this.
25    Depending on how long the answers are, I think we

Page 39

1  can get through this, but we'll see.
2     I would like to get through Opinion No. 1, if we
3  can.
4     If it's taking too long, let me know, and we can
5  take a break.
6            MR. TODARO:  Are you okay, Julia?
7            THE WITNESS:  I'm okay for right now.
8  Q  (By Mr. Bridgman)  What is Continental's policy, when you
9  look at the various-- you said, "No systemic problems for
10 paying to its insured, in UIM cases in Washington, the
11 reserves or the amounts that are reserved"?
12            MR. TODARO:  Object to form.
13            THE WITNESS:  I'm not really following
14 your question.
15    We haven't talked about reserves yet.
16    Are you now switching to the topic of reserves?
17 Q  (By Mr. Bridgman)  I'm asking-- yeah, you've got-- you
18 talk about Continental's got good policies, right?
19 A  Right.
20 Q  And that the Continental policies meet, in your view, or
21 exceed the standard of care, right?
22 A  That's correct.
23 Q  And I want to know, what is Continental's policy with
24 regard to paying to its insured, in a UIM claim in
25 Washington, amounts that Continental has reserved?

Page 40

1  A  Well, reserves typically are not the amounts paid to the
2  insured.
3     Reserves are typically consistent with two elements:
4  No. 1, is the anticipated costs that are chargeable to
5  the claim, attorney costs, record costs, all of those
6  other costs; No. 2, the amount that shows the potential
7  risk of what is needed to be paid in terms of payments to
8  the insured.
9     It's my view that once the reserves are set, that
10 that reserve encompasses both of those elements, and at
11 that point in time, from what I saw of Continental's
12 system, in terms of reserving, it is my opinion that it
13 adequately complied with Washington law in terms of when
14 and whether the amounts of the reserves should be paid.
15    In particular, towards the-- close to when the
16 actual policy limits were paid, there was a reserve
17 change that was made to $600,000 and then a reserve
18 change very quickly thereafter made to up to $1 million.
19    By "quickly" I mean in less than one week.
20    Continental requires its claims people to
21 appropriately commit to those reserves and to pay what is
22 the appropriate amount to pay in the particular case.
23    In this situation there was a delay in
24 Ms. Davenport's reserves, even after she had received the
25 expert opinion, and she did not do it timely.  It was

Page 41

1  against the policies of Continental, but ultimately that
2  reserve was changed on October 3rd, and then it was
3  further changed on October 10th, I believe, for the
4  million dollar policy limits, and those policy limits
5  were promptly paid thereafter.
6  Q  So that's a long answer.
7     What is Continental's policy regarding paying
8  reserve amounts?
9            MR. TODARO:  I am going to object,
10 Geoff.
11    She will give the answers to your questions, and I
12 would like you to stop characterizing her answers in such
13 a way that you feel they are unnecessarily long.  Ask
14 your questions, and she'll answer them.
15 Q  (By Mr. Bridgman)  I will ask again.
16    Without the explanation as to how reserves were
17 changed in this matter, what is Continental's policy
18 regarding paying amounts that are reserved to UIM
19 claimants?
20            MR. TODARO:  Object to form.
21            THE WITNESS:  I thought I addressed
22 that, and I thought I addressed it completely within my
23 answer.
24 Q  (By Mr. Bridgman)  Is it the policy to pay reserved
25 amounts or to not pay reserved amounts?

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                    Pages 42..45

Page 42

1        MR. TODARO: Object to form.
2        THE WITNESS: Again, I responded to
3    that in my prior response to your question.
4 Q  (By Mr. Bridgman) Does Continental's reserve policy
5    involve including defense costs into the reserves?
6 A  I responded to that in my prior answer.
7 Q  And the answer to that is "yes," correct?
8 A  That's correct.
9 Q  So you indicate that Continental had training policies
10    that complied with industry standards and Washington
11    requirements, correct?
12 A  Correct.
13 Q  Would you agree that part of training is also follow-up
14    to make sure that the things that people are trained on,
15    that they actually follow through on them?
16 A  No, I wouldn't agree with that.
17        That's not part of training itself.
18        You can try and train people as well as you can by
19    having the classes available and the appropriate ones
20    available in terms of that.
21        Whether or not they actually retain that, it depends
22    upon the different individuals, but that is not part of
23    training. That is part of oversight, and it's part of
24    what a claims professional himself or herself actually
25    does.

Page 43

1 Q  You mentioned oversight.
2        Does the standard of care require people who
3    supervise the frontline adjusters to take steps to ensure
4    that they are complying with Washington law and
5    Continental's own policies and procedures and the
6    standard of care?
7 A  The first aspect of what you just asked is that, in fact,
8    it is the claims professional, first and foremost, who is
9    required to respond to a particular claim in a consistent
10    manner with Continental's policies and the policies of
11    the particular state in which the claim is involved in.
12        That claims person has the absolute obligation to
13    make that compliance.
14        The managers in Continental have a-- meet the
15    standard of care, in my view here, in reviewing
16    Ms. Davenport's handling of the case, but the fact of the
17    matter is that they were unaware that she had not been
18    corresponding for a period of time, after April 1, 2021,
19    with counsel for claimant, so there is an issue there
20    about failure to comply by Ms. Davenport, but in my view,
21    the way that the structure was set up by Continental
22    was-- very much met the standard of care, and if a claims
23    person chooses to obscure or fails to do what they say
24    they are going to do, then it's not a failure of
25    management, it is the failure of the claims person to do

Page 44

1    that.
2 Q  So in your review of all of the materials, do you think
3    that management made any failures whatsoever, with regard
4    to the handling of Ms. Cohodas's claim?
5 A  In my review of this matter, I do not believe that
6    management made failures in the handling of this claim
7    and the appropriate supervision.
8        I think that the structure of management was such
9    that it was very appropriate within the lines of
10    insurance, and Ms. Davenport, the claims handler, had
11    many years, more than 20 years, of experience. She was a
12    senior person assigned to this, a senior-- her specialty
13    was in severe risk, so all of those things were done.
14        I think that Continental had actually an
15    extraordinary level of competence in installing a
16    computerized system in 2022 which actually monitored
17    electronically whether or not there had been any activity
18    on a file.
19        In fact, they discovered that Ms. Davenport had not
20    been responsive in her file, and by April of 2022 had
21    begun a series of constant checks and monitoring on-- not
22    constant, but appropriate checks and monitoring on
23    Ms. Davenport's handling of the claim, which ultimately
24    unveiled the fact that she had not been timely
25    responding.

Page 45

1        She was spoken to, and she was asked to respond.
2    She showed greater response during that period of time,
3    but it was only through the implementation of this system
4    that I think that really they were able to see that there
5    was no activity in the file because it was otherwise
6    obscured by her notes in the file.
7 Q  The file, regardless of whether the notes were there,
8    did, in fact, contain the policy limits demand, correct,
9    the one that went unresponded to?
10 A  It did.
11 Q  And no manager ever looked at the file to determine
12    whether or not there was an unresponded-to policy limits
13    demand, correct?
14 A  No one picked that up until April-- actually, later than
15    April of 2022.
16        It wasn't until counsel was aware of it.
17 Q  It wasn't until counsel was aware of it?
18        I want to make sure I understand.
19        When did anyone at Continental, other than
20    Ms. Davenport, become aware that there were not one but
21    two policy limits demands that had been ignored?
22 A  So now you are talking about two policy limits--
23 Q  Two, right?
24 A  In April of 2021, and I believe there was a second one in
25    August of 2021.

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 46..49

Page 46

1    Is that correct?

2  Q   Yes.

3  A   And you are asking when they became aware?

4  Q   Yeah.

5  A   They did not become aware of that until October of 2022.

6  Q   And are you aware of any discipline, formal or informal,

7      that Ms. Davenport received from Continental as a result

8      of the multiple failures you have identified in this

9      case?

10  A   Other than her being talked to in terms of this and

11      having been reported on her personnel file that she was

12      not in compliance in this case, I don't know of any

13      additional discipline that was given to her.

14  Q   It is your belief that she was reported as not being in

15      compliance on this case in her personnel file?

16  A   She was talked about in terms of not being in compliance

17      in this case.

18      I understand that she was talked to.

19  Q   Do you agree that it's a red flag or a warning sign when

20      an adjuster requires management prodding in order to do

21      their work?

22  A   I am not a personnel manager, in terms of red flag

23      warnings or not.

24      I have never been involved in HR.

25      I think that in this situation, as soon as

Page 47

1      management became aware that there was both nonresponse

2      to a policy limits demand and, more importantly, that

3      information had come from the expert treating physicians

4      of Ms. Cohodas under oath, that they believed that her

5      injuries and conditions were substantially the result of

6      the motor vehicle accident in 2015, management engaged in

7      and very quickly, much more quickly than is customary in

8      insurance practice, very quickly, enabled the policy

9      limits to be paid to Ms. Cohodas.

10      MR. BRIDGMAN:  Okay.  This is probably

11      a good time to take a break.

12      Thank you for indulging me so we could finish this

13      topic.

14      THE WITNESS:  Thank you.

15      (Recess 10:24 to 10:38 a.m.)

16  Q   (By Mr. Bridgman)  We are back on the record.

17      Ms. Lester and the court reporter were kind enough

18      to remind me, we talked a bit about Ms. Owen's report.

19      We have marked it as Exhibit No. 2.

20      Can you just please confirm that Exhibit No. 2 is

21      Ms. Owen's report that you were discussing earlier?

22  A   Just a moment.  I have to pull that up.

23      That's under "Shared content"?

24  Q   Yes, and it's the second of the two Exhibit No. 2s.

25  A   I am not getting it.

Page 48

1      It would be "Shared content"?

2  Q   No, I'm sorry, it's not under "Shared content."

3      It's in "Chat."

4  A   Okay.  That's what I needed to know.

5      I don't see it in chat either.  All I get is an

6      ability to share my own chats there.

7      MR. BRIDGMAN:  Kari, can you just pull

8      it up, share the screen, so we can make sure we have it?

9  Q   (By Mr. Bridgman) Ms. Molander, we have sort of scrolled

10      through on our screen what's been marked as Exhibit

11      No. 2.

12      Can you identify that for us, please?

13  A   Yes.  That is the expert disclosure and opinion of

14      Plaintiff's expert, Mary Owen.

15      MR. BRIDGMAN:  Thank you.  We can go

16      ahead and take that down.

17  Q   (By Mr. Bridgman)  Looking at your report and your second

18      opinion on Page 5, the heading reads, "Continental's

19      handling of Ms. Cohodas' claim for the time period

20      between the accident and the policy limits demand met

21      industry standards."

22      Is that correct?

23  A   Yes, that that's what it says.

24  Q   Okay.  I want to make sure, you are aware, are you not,

25      that Ms. Cohodas is not suing as a result of

Page 49

1      Continental's conduct prior to her presenting the policy

2      limits demand?

3  A   I was not aware of that, but I think that it's very

4      important to place, in any event, the context here that,

5      in fact, the six years of claims handling that preceded

6      that did meet industry standards.

7  Q   And I want to make sure that we're clear.

8      It's my understanding that Continental is not

9      claiming that any of the events that took place prior to

10      Ms. Lester presenting the policy limits demand are

11      defenses in this case.

12      Is that your understanding as well?

13  A   I do not have any understanding one way or the other in

14      terms of that.

15      It is important for my evaluation overall of this

16      matter, and the handling of this matter overall, to

17      determine whether or not industry standards were met from

18      the very inception of the claim being first tendered.

19  Q   And I want to make sure we've got a lot of the sort of

20      back and forth between Ms. Lester and Ms. Davenport on

21      things like getting a copy of the policy and getting the

22      Hamilton buyout done, those types of things-- that you're

23      not claiming that Ms. Lester was at fault somehow or

24      breached duties to Continental, are you?

25  A   Ms. Lester has no relationship with Continental.

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 50..53

Page 50

1     She has relationships with her attorney.
2     In terms of what information has been submitted,
3   there is an obligation that others participate and give
4   information in order to be able to allow the insurance
5   company to fully evaluate the claim.
6     There was a gap in responsiveness on the part of
7   Ms. Lester.
8     She is not in a relationship with Continental, she
9   is in an adversary relationship with Continental, but she
10  did not respond to any number of requests for bills,
11  medical information, and status updates that were given
12  to her over the course of the period of handling this
13  matter.
14    That does go into my evaluation of the claim
15  altogether.
16    In UIM cases, that typically does not happen.
17  Typically what happens is if you have a claim for
18  benefits under the policy, you are giving bills, you are
19  giving information, you are giving evaluations, even if
20  those evaluations change over time by medical experts,
21  and that did not happen, despite the fact that it was
22  requested a number of times by Ms. Davenport.
23    The discussion of whether or not the handling, prior
24  to April 1, 2021, was in compliance with industry
25  standards is important because it sets the context of

Page 51

1   what was or was not provided and what was or was not kept
2   under wraps in that period of time.
3 Q   So let's make sure we're clear on one thing:
4     Ms. Davenport eventually did get all of the medical
5     records, correct?
6 A   She got all of the medical records and was given 20 days
7     in which to respond to the demand and the 2,500 pages of
8     medical records.
9 Q   And she never read the medical records, correct?
10 A   That's what she says.
11 Q   Didn't read them in the first 20 days, didn't read them
12    in the year-plus that followed?
13 A   Completely violated Continental's standards in terms of
14    this.
15 Q   And whether or not Ms. Lester did or didn't provide the
16    records prior to presenting the demand does not excuse
17    the failure to read the medical records, does it?
18 A   It certainly did not meet Continental's standards in her
19    failure to read the medical records.
20 Q   And whether or not Ms. Lester did or didn't provide
21    records earlier than providing the entire demand at one
22    fell swoop, that does not excuse Continental's failure to
23    respond to the demand, correct?
24 A   Not correct.
25    It is unusual and not customary for counsel in a UIM

Page 52

1   case to withhold medical records and withhold medical
2   bills so that a claims person over time can get an idea
3   of what is going on in the case, get an idea of what
4   might need to be paid, what might need to be done, not
5   all at once at one fell swoop and with a 20-day time
6   limit.
7     That having been said, Ms. Davenport, according to
8   her own testimony, never read the medical records.
9 Q   So I want to take a break for a minute.
10    MR. BRIDGMAN:  Anthony, if this is a
11  defense in the case, Kari Lester is going to be a
12  witness.
13    If you're going to put up, you know, all the
14  pre-conduct-- I understand it for context, that's fine,
15  but if that acts as an excuse for Continental's behavior,
16  then we'll identify Kari right now and make arrangements
17  to get her deposed.
18    MR. TODARO:  I don't even understand
19  your point, Geoff, but I am happy to talk to you.
20    I think Julia was very clear on the importance of
21  the history of the claim from inception, including the
22  applicability of the WACs that you have identified that
23  relate to when the notice of the claim came in.
24    I note that Mary Owen spends page after page talking
25  about 2015, 2016, 2017, 2018, so I don't get your point,

Page 53

1   but if you want to go off the record and have a
2   discussion about it, I'm happy to do it.
3     MR. BRIDGMAN:  We are off the record.
4   We are having a discussion.
5     (Discussion off the record.)
6 Q   (By Mr. Bridgman)  You are aware that Ms. Cohodas was
7   receiving ongoing treatment up to and even after the date
8   of the policy limits demand, correct?
9 A   Yes. I've seen the medical records.
10 Q   You have seen the medical records.  You actually read the
11  medical records, correct?
12 A   Correct.
13 Q   And no human being at Continental read any of the medical
14  records prior to this case, correct?
15 A   That's not correct.
16  Paul Smith, who was part of-- who was representing
17  Continental, and if you use "Continental" writ large, was
18  in fact involved in this case and did, in fact, have the
19  medical records or was aware of the medical records.
20 Q   Other than Paul Smith, no human being employed at the
21  Continental Insurance Company, who got a paycheck from
22  the Continental Insurance Company, or CNA, had read or
23  reviewed any of the medical records, correct?
24 A   Correct, but the doctor also, that was retained by
25  Continental, in fact read the medical records.

Page 54

1  Q   And the doctor who was retained by Continental was not a
2      Continental employee but was instead acting as an
3      independent contractor, correct?
4  A   Importantly, yes, that was the correct way to do it.
5         That is a perfectly reasonable thing to have happen,
6      which is when you have a complicated and unusual case
7      like this, which is first diagnosed as a whiplash and
8      then evolves into a situation which has additional
9      conditions attributed, with an eggshell plaintiff's prior
10     experience with other incidents that caused similar
11     conditions, it is an impossible job for a-- a virtually
12     impossible job for a layperson, who is not in the medical
13     profession, to understand the importance of all this
14     without having had expert opinions.
15        In my view it was appropriate for Continental to
16     retain the expert and have her go through that and
17     ultimately have-- when, in fact, the expert treating
18     physicians gave testimony on behalf of Ms. Cohodas in the
19     form of declaration, signed under penalty of perjury,
20     that, in fact, her condition was caused by this accident.
21        Contrary to some of their determinations or their
22     determinations earlier, it was appropriate, at that point
23     in time, to have a determination among people at
24     Continental that, in fact, at that point in time it
25     became reasonable and clear that, in fact, she had such a

Page 55

1      condition and should be, in fact, paid the policy limits,
2      and they did so.
3  Q   So you are talking about stuff that's in Opinion No. 4.
4         Right now I am focused on Opinion No. 3.
5         How many--
6  A   Opinion No. 3?
7         I disagree with you.  In fact, that does have to do
8      with Opinion No. 3 and Opinion No. 2.
9  Q   I misspoke.  We are talking about Opinion No. 2, so let's
10     make sure that we are clear.
11        So how many UIM cases have you handled as defense
12     counsel in the state of Washington?
13 A   I have handled, as far as I know, no defense counsel UIM
14     cases.
15        I have handled UIM cases as counsel on behalf of the
16     insurance company, I think at least once in Washington
17     and a number of times in California.
18 Q   And it is your testimony that the standard is that
19     plaintiff attorneys seeking UIM benefits will provide the
20     insurance company with bits and pieces of updates on
21     medical records as opposed to just packaging them all up
22     at the end and presenting a demand; is that right?
23 A   That it is customary for that to happen in UIM cases is
24     what I've experienced.
25 Q   Is it customary for that to happen in UIM cases in

Page 56

1      Washington?
2  A   The one case that I can recall, where I was involved as
3      counsel on behalf of the insurance company, I think that
4      there was information given at various points in time in
5      the case that updated both the medical records and the
6      billings involved in the records.
7  Q   Would that be cases where there was also PIP, so that the
8      insurance carrier was paying for the medical treatment as
9      well?
10 A   I honestly cannot remember whether PIP was involved one
11     way or the other, but where you have a circumstance where
12     you have significant invoices that are outstanding from
13     various medical providers during the course of the UIM
14     claim, it is pretty typical that those would be, in fact,
15     submitted to the insurance company to view in context of
16     the case, and if there was liability, causation, and
17     damages, to pay those.
18 Q   So eventually they were submitted, and Continental did
19     not pay them for well over a year, correct?
20 A   Continental had no knowledge of these billings and
21     payments, except that they were, in fact, given to
22     Ms. Davenport.
23        There was nothing that they were aware of with
24     respect to the medical records.
25 Q   Okay.  Let's move on to Opinion No. 3.

Page 57

1  A   All right.
2  Q   Page 7.
3         So the heading says, "From October 2021 to the
4      conclusion of the case in October of 2022, Continental
5      acted responsibly in hiring counsel and retaining a
6      medical expert," correct?
7  A   Correct.
8  Q   The Forsberg & Umlauf firm, was that a firm that was
9      known to you prior to this case?
10 A   Absolutely.
11 Q   They are a good firm, right?
12 A   Their reputation is as a good firm.
13 Q   And you are aware that the claims in this case that
14     Ms. Cohodas is making aren't that it was a breach of the
15     standard of care to hire the Forsberg & Umlauf firm,
16     right?
17 A   The fact is that that conceivably could be a part of a
18     claim that an insurance company did not act responsibly,
19     but here, in fact, Continental did act responsibly in
20     hiring Forsberg & Umlauf to handle the case for the
21     arbitration.
22 Q   And you are aware that Ms. Cohodas does not contend that
23     it was inappropriate for Continental to hire a medical
24     expert?
25 A   I think that part of the context of the entire case is,

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 58..61

Page 58

1    in fact, that this was an instance-- Continental acted
2    reasonably in hiring a medical expert in particular to
3    review the medical records and to give an opinion with
4    respect to whether there was causation between the
5    conditions suffered by Ms. Cohodas and the motor vehicle
6    accident.
7  Q   Now, you say from April 2021 to the conclusion they acted
8      responsibly in hiring counsel and retaining an expert,
9      but they didn't hire counsel in April 1, 2021, did they?
10 A   They did not. They hired counsel in July of 2021.
11 Q   And they didn't retain an expert until July of 2022,
12     right?
13 A   Well, Continental approved an expert prior to that time.
14     I am almost-- I think it was in May of 2021, but the
15     expert, in fact, was not hired until July of 2022.
16 Q   And nothing prevented Continental, on April 1, 2021, from
17     retaining an expert so that they could evaluate
18     Ms. Cohodas's demand, correct?
19 A   I don't know whether anything interfered with that.
20     Once the request was made, it was approved, and
21     there was no interference in terms of, or objection to,
22     hiring a medical expert, particularly in this complicated
23     case.
24 Q   So would it have been appropriate for Continental to have
25     hired an expert immediately upon receiving Ms. Cohodas's

Page 59

1    policy limits demand?
2  A   That kind of turns the inquiry on its head.
3      It was appropriate for Continental to retain an
4      expert when they did retain the expert.
5  Q   So it's appropriate for Continental to wait until July of
6      2022 to retain an expert to review medical records in a
7      demand that had been presented on April 1st, 2021?
8  A   Continental unfortunately was not aware of the demand.
9      Continental did not know about the demand.
10     The only person at Continental who knew about the
11     demand was Cindy Davenport, and for reasons that she
12     cannot explain, she violated Continental's procedures in
13     failure to raise the demand with her superiors and to let
14     them know that this demand had been made.
15     The inquiry really is was it appropriate to retain
16     an expert, and the answer is absolutely, and they
17     retained the expert at the request of Ms. Davenport, or
18     she had gotten the approval, and it was retained by
19     counsel through-- Dr. Kenyon was retained by counsel but
20     unfortunately not until July of 2022.
21     Why counsel at Forsberg & Umlauf failed to do that,
22     I have no reason-- I have no idea.
23 Q   Forsberg & Umlauf were acting as agents for Continental,
24     correct?
25 A   That's an issue of law that I did not address with

Page 60

1    respect to my opinion, and I don't believe that I could
2    tell you, in terms of agency law, whether or not they
3    acted as agency.
4      They certainly were counsel for Continental with
5      respect to the handling of the arbitration.
6      If they acted outside the bounds of what they should
7      have done as counsel, I can't answer for you whether or
8      not that violates agency principles or not.
9      I am not in the position to say whether or not they
10     were the agent of Continental.
11     I know that for ten months, after being asked to
12     retain the expert, Mr. Smith did not do so.
13     That, in my view, was problematic in terms of the
14     ability of Continental to engage in fair claims handling
15     with respect to this case because they just simply did
16     not know that the expert had not been retained yet.
17 Q   And remember, of course, Continental had already violated
18     the fair claims handling by not responding to the policy
19     limits demand at any time prior to even retaining
20     Mr. Smith, correct?
21         MR. TODARO: Object to form.
22         THE WITNESS: I am not in a position
23     to be able to make the ultimate determination in terms of
24     that.
25 Q   (By Mr. Bridgman) But you are in a position to say that

Page 61

1    Continental did not respond within ten days-- did not
2    acknowledge receipt within ten days of the policy limits
3    demand, right?
4  A   Absolutely. There is no contest with respect to that.
5      Ms. Davenport didn't do it.
6  Q   And did not complete an investigation within 30 days of
7      receiving the demand, correct?
8  A   Again, that in itself does not, in my opinion, constitute
9      a violation of IFCA or of the rules, and the reason is
10     that it's got to be a reasonable period of time to
11     review, but the fact of the matter is the communication
12     did not occur, and the investigation was not completed
13     within that period of time because the doctor had not yet
14     been retained to do the investigation.
15     It wasn't until July of 2022 that the doctor was, in
16     fact, retained.
17 Q   Ms. Davenport did not complete an investigation within
18     30 days of receiving the demand, correct?
19 A   No investigation was completed nor could it have been.
20     I mean, the final investigation really relied upon
21     the information received from Ms. Cohodas's doctors,
22     which until October 7th, 2022 was still uncertain, still
23     not-- difficult to say that there was a direct connection
24     between the injuries that she suffered or the condition
25     that she had and the accident.

Page 62

1      Then on October 7th, 2022 the determination by these
2   two preeminent doctors was certain, they said within a
3   reasonable medical certainty, and this was under oath.
4      At that point in time, Continental acted very
5   quickly in paying the policy limits.
6 Q  Yeah, but I'm going way back, right?
7      We are talking about--
8 A  Well, not too far back, right?
9 Q  We are talking about Paul Smith.
10     I am just trying to point out, more than ten days
11   had elapsed after receipt of the policy limits demand
12   before Mr. Smith was retained, correct?
13 A  Mr. Smith was retained in July of 2021, so you can--
14 Q  Yeah, and that's more than 30 days after the receipt of
15   the demand, correct?
16 A  Right, that was more than 30 days after receipt of the
17   demand.
18 Q  And Continental had an obligation to try and do an
19   investigation during that 30-day period, correct?
20 A  Continental had an obligation to communicate.  They did
21   not.  Cindy Davenport did not communicate with respect to
22   this.
23 Q  And you've talked about causation being an issue.
24     Where or when did Continental communicate with
25   Ms. Cohodas to tell her that they challenge causation?

Page 63

1 A  Continental could not communicate with Ms. Cohodas
2   because your firm was representing her, so there was no
3   opportunity to ever communicate directly with her, but
4   with respect to the decision-- the evaluation by
5   Dr. Kenyon, who raised the issue of the eggshell
6   plaintiff, raised the issue regarding the prior medical
7   conditions, the uncertainty of the doctors in their
8   initial reports that were included in the April 1, 2021
9   demand, and then the certainty, finally, in October of
10   2022, that settled the issue, that they were willing to
11   say under penalty of perjury that these conditions
12   suffered by Ms. Cohodas were, in fact, directly a part of
13   the accident and not due to other prior existing
14   conditions that she had suffered before the accident
15   occurred.
16 Q  When, if ever, did Continental inform Ms. Cohodas,
17   through her counsel, that it challenged causation?
18         MR. TODARO:  Object to form.
19         THE WITNESS:  The fact that
20   Continental was requiring the records of the medical
21   experts and that those were at issue, and that there was
22   an admission that, in fact, there was an eggshell
23   plaintiff here in the medical records, indicates the
24   issue was clearly on the table as to whether or not the
25   conditions of Ms. Cohodas were caused by this motor

Page 64

1   vehicle accident.
2 Q  (By Mr. Bridgman)  Are you aware of whether or not
3   Continental shared these oral opinions with the medical
4   expert that it retained?
5         MR. TODARO:  Object to form.
6         THE WITNESS:  I don't know whether
7   that happened or not.
8      I know that there was discussion between Paul Smith
9   and the medical expert, and that Continental's medical
10   expert concluded that, in fact, she had conditions that
11   looked like they were not connected with, or at least not
12   entirely connected with, the accident, and she also
13   determined that she did not think that the reported
14   condition of POTS, P-O-T-S, all caps, was related to the
15   motor vehicle accident.
16 Q  (By Mr. Bridgman)  Yeah, I understand all that, but the
17   issue that I'm trying to get at is:
18     When did anyone at Continental tell Ms. Cohodas that
19   they disputed causation?
20 A  I've already answered that.
21         MR. TODARO:  Objection; asked and
22   answered.
23 Q  (By Mr. Bridgman)  I did not understand that answer at
24   all.
25     Can you please tell me when, because I did not get

Page 65

1   it from your prior answer?
2         MR. TODARO:  It was answered
3   completely.
4      Objection; asked and answered.
5      Julia, if you want to answer it again, you can.
6         THE WITNESS:  The records that date
7   from 2018 through the conclusion of this matter indicate
8   that there were discussions regarding whether or not, in
9   fact, Ms. Cohodas's conditions were caused by the motor
10   vehicle accident.
11     That was the only issue in this case.
12     The fact that there was a motor vehicle accident,
13   that was already there.
14     The fact that there was no fault on the part of the
15   driver of the car, Ms. Cohodas's friend, Ms. Silver, that
16   was established.
17     The fact that Ms. Cohodas was entitled to coverage
18   under the policy issued to Ms. Silver's father's
19   business, that was established.
20     All those were established.
21     The only issue left, throughout this, and the reason
22   for the medical records, was, in fact, to determine what
23   part, if any, Ms. Cohodas's prior medical conditions
24   played in terms of her condition, which was initially
25   diagnosed by her own physician as a whiplash.

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                    Pages 66..69

Page 66

1    The fact that other medical conditions increased
2    occurred during the course of her treatment complicated
3    this issue tremendously, and this was the whole point of
4    the interchange with counsel for Ms. Cohodas.
5        I am mystified as to the question in and of itself
6    because this was the whole point of the determination
7    that medical records were needed.
8  Q  (By Mr. Bridgman)  You say the records show, from 2018 to
9    the end of the case, causation.
10       What I want to be clear about is, what records are
11   you talking about?
12       What communication went from either Continental or
13   Paul Smith to Kari Lester saying, "We dispute causation"?
14       MR. TODARO:  Object to form--
15       THE WITNESS:  It was asked and
16   answered.
17       The questions that were recorded in the claims file,
18   the answers, the determination of why the medical records
19   were needed, is all part of that.
20       There was only one question in this entire case,
21   which is, "Were her medical conditions caused by the
22   motor vehicle accident?"
23       All the other questions you have in a UIM case, they
24   were not part of this case.  You only had this one
25   particular question.

Page 67

1  Q  (By Mr. Bridgman)  And just to be clear then, the source,
2    the place that I would go to find the communications
3    then, I would go to the claim diary and see the notations
4    of the calls between Ms. Lester and Ms. Davenport, that's
5    where I will find the fact that they were-- that
6    Continental was challenging causation and told Ms. Lester
7    that?
8  A  It could be in the claims diary, but more importantly, it
9    is the whole fact of this case.
10       You cannot look at this matter without realizing
11   that, in fact, the sole legal issue, with respect to the
12   UIM case, is, in fact, that the-- the question of whether
13   or not Ms. Cohodas's condition was caused by the motor
14   vehicle accident and whether or not her prior conditions
15   played any role in that.
16 Q  So we have alluded to but not talked much about the
17   second policy limits demand.
18       You are aware there was a second policy limits
19   demand that came in?
20 A  I am.
21       We have talked about that.
22 Q  Yeah, just not a lot.
23       So do we agree that Ms. Davenport breached the
24   standard of care by not responding to the second policy
25   limits demand and/or by not giving direction to her

Page 68

1    defense counsel on how to respond to the second policy
2    limits demand?
3  A  The demand was known to defense counsel on October-- on
4    August 31st of 2021.  I understand that Ms. Lester sent
5    defense counsel the policy limits demand.
6        I don't think that the medical records were included
7    in that, but she did send the demand with respect to the
8    policy limits.
9        Ms. Davenport did not comply with Continental's own
10   policies in failing to communicate that demand to her
11   superiors, and she further failed in not responding to
12   defense counsel's communications asking for something-- a
13   response with respect to the policy limits demand.
14       The counsel, Mr. Smith, did, in fact, acknowledge
15   the receipt of that demand to Ms. Lester but did not
16   follow through with respect to it.
17 Q  And you indicate, on Page 9 of your report, on
18   September 10th he, referring to Mr. Smith, sent a letter
19   to Ms. Lester acknowledging the receipt of the demand and
20   indicating that "Continental would like to mediate once
21   it had more information regarding Ms. Cohodas's
22   symptoms," correct?
23 A  Yes, that's my review of that particular letter.
24 Q  And Mr. Smith had no authority from Continental to say
25   that it wanted to mediate at that time because Cindy

Page 69

1    Davenport hadn't communicated with him, correct?
2  A  I don't know that I can agree with you.
3        He may or may not have had authority to set up a
4    mediation.
5        She may have discussed that with Mr. Smith.
6        I think that there had been communications between
7    them, so I don't think that that's correct.
8  Q  And it indicates here that Continental would like to
9    mediate once it had more information regarding
10   Ms. Cohodas's symptoms?
11 A  Right.
12 Q  What information did Mr. Smith indicate that Continental
13   needed?
14 A  I don't think the letter was explicit on that.
15 Q  You don't think that the letter said, "We would like to
16   schedule an IME"?
17 A  It may have said that.
18 Q  And, in fact, the expert said that she didn't need an
19   IME, correct?
20 A  Ultimately the expert, when she received the medical
21   records in July of 2022, said she did not need an IME.
22       It is customary to have an IME in many UIM cases,
23   but in this situation she felt she had enough to be able
24   to assess the situation, or so she reported, without an
25   IME.

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 70..73

Page 70

1  Q  So Footnote No. 3, on Page 9, you say, "Regardless of the
2     demand terms, Continental had an obligation to pay the
3     UIM policy limits of $1 million within a reasonable
4     period of time after Continental received information
5     from Ms. Cohodas that her condition was caused by the
6     rear-end accident."
7  A  It goes on to say, "The receipt of this information did
8     not occur until October 7th, 2022, and policy limits were
9     paid shortly thereafter."
10 Q  Are you aware of any evidence in the record showing that
11    anyone at Continental, or employed by Continental,
12    including its counsel, indicated to Ms. Cohodas, through
13    Ms. Lester, that the information that had been provided
14    in the policy limits demand, including all of the medical
15    records, was somehow insufficient to demonstrate
16    causation?
17 A  The report from Dr. Kenyon, based on the medical records,
18    was, in fact, that she did not believe there was
19    causation of Ms. Cohodas's condition by the motor vehicle
20    accident, or if there was, it was not to the extent that
21    there was a serious issue there in terms of causation.
22       She came down on saying that she did not believe
23    that Ms. Cohodas was suffering from POTS, but that she
24    did have other medical conditions and that it was unclear
25    whether or not this was involved-- exacerbated damages

Page 71

1     from the motor vehicle accident; in other words, it is a
2     complicated eggshell plaintiff situation.
3        This was communicated to counsel for Continental.
4        This really comported with, in large part, the
5     medical records themselves, taken from the various
6     treating physicians that Ms. Cohodas had consulted over
7     the years with in terms of the conditions she suffered
8     from.
9        It was not, in fact, until October 7th, 2022 when
10    Dr. Singh, who was urged by counsel to clarify his report
11    so that it could be made certain that the conditions
12    were, in fact, related to the motor vehicle accident,
13    that Dr. Singh concluded that, in fact, they were caused
14    by the motor vehicle accident, and Dr. Grubb also gave
15    testimony that they were caused by the motor vehicle
16    accident.
17       At that point in time it was reasonably certain that
18    some or all of her conditions were caused by the motor
19    vehicle accident.
20       With that in mind, Continental reasonably paid its
21    policy limits and very quickly after that information was
22    received.
23 Q  My question though was:
24       Did anyone at Continental, whether their counsel or
25    Continental, communicate with Ms. Lester to let her know

Page 72

1     that they challenged causation after receipt of the
2     demand?
3        I understand Continental hired an expert, they
4     looked at it, and all that, but what I'm looking at is
5     the communication between Continental and its insured
6     through its counsel.
7  A  There could not be any other issue involved.  There could
8     not have been.
9        There was only one issue, which is whether or not
10    these conditions were caused by the motor vehicle
11    accident or some other source or some combination, so you
12    would have to sort out the two and have to figure out
13    what was allocated to what.
14       That is the only issue in the case.
15       That is why you guys wanted arbitration, for the
16    arbitrator to decide ultimately in terms of this
17    complicated eggshell plaintiff situation.
18    I don't know how it was communicated, explicitly,
19    implicitly, but it was clear that this was the only issue
20    involved in the case.
21 Q  Are you aware of, other than the idea that it was
22    implicit in the overall case, that anyone at Continental,
23    or its counsel, advised Ms. Cohodas, through Ms. Lester,
24    that it challenged causation?
25 A  I have answered.

Page 73

1        My prior answer stands.
2  Q  How could Continental challenge causation when it had
3     never even read the medical records?
4        MR. TODARO:  Object to form.
5  Q  (By Mr. Bridgman)  Yeah, let's be more precise on that.
6        When did Continental decide that it was challenging
7     causation?
8        MR. TODARO:  Object to form and
9     foundation.
10 Q  (By Mr. Bridgman)  Do you know when Continental decided
11    it would challenge causation?
12       MR. TODARO:  Object to form.
13       THE WITNESS:  I have the same-- I have
14    the issue of when did they challenge causation.
15       The initial-- the customary and initial reports in
16    this situation would indicate, to any experienced claims
17    person, that this was a case of whiplash and not the
18    seriousness that ultimately was determined that it was.
19       By definition, this was a situation where the issue
20    of causation was, in fact, very important, and the policy
21    limits were $1 million.
22       It would be reasonable to assume that this was, in
23    fact, the sole issue involved in this case.
24       Any person handling, from the claims side or from
25    the claimant's side, in terms of this case, would know

Cohodas vs The Continental Insurance Company
Molander, Julia -  March 28, 2024                                                    Pages 74..77

Page 74

1    that that was the case.
2        It was essential that, in fact, there be an inquiry
3    ultimately as to what was, in fact, the amount of the--
4    the conditions suffered by Ms. Cohodas, be determined
5    whether or not it was attributable to the accident.
6        Her conditions are unusual.
7        It is unusual for any kind of rear-ender to result
8    in those kinds of conditions.
9        That is an appropriate inquiry, and it was the only
10   inquiry in this case.
11 Q   (By Mr. Bridgman)  So on April 1st Continental gets all
12   the medical records in the demand, right?
13 A   They apparently got all the medical records.
14       Ms. Davenport got all the medical records.
15 Q   And without reviewing any of the medical records,
16   Continental determined that causation was an issue; is
17   that fair?
18 A   I think causation was fairly at issue prior to that time.
19       That was the whole issue in this case.
20       That is why, no doubt, that the medical records were
21   delayed in being handed to Continental per their inquiry
22   because it was not yet sorted out among Ms. Cohodas's
23   doctors as to what part of her condition was attributable
24   to the motor vehicle accident.
25       It wasn't until October 7th, 2022 that that became

Page 75

1    clear.
2  Q   So you have a number of criticisms of Mr. Smith; is that
3    fair?
4  A   That's fair.
5  Q   You indicate that his behavior was shocking, in some
6    respects, for not responding more promptly; is that fair?
7  A   I think that his behavior was shocking in the sense that
8    matters were stated in his billing statements that never
9    were performed, that he had billed for these supposed
10   review of records, supposed retaining of or pursuing
11   mediation, supposed retaining of the expert, and to me it
12   is always shocking when an attorney does not-- is not
13   forthright to their client.
14       In this situation it was absolutely not forthright.
15       In reading his billing statements, you would think--
16   a reasonable person would think that, in fact, he was
17   doing all of these things that were, in fact, necessary
18   or at least reasonable with respect to handling of the
19   ultimate arbitration matter, and, in fact, he had done
20   none of that, so that's what I found shocking.
21 Q   And you are aware that Ms. Davenport never reviewed any
22   of his billing records, correct?
23 A   I am not aware that-- well, I don't consider that in my
24   opinion.
25       Somebody read his billing records.

Page 76

1  Q   And you agree, don't you, that Continental cannot
2    outsource its adjusting responsibilities to Mr. Smith?
3  A   I agree with that.
4        They cannot outsource the adjusting
5    responsibilities, but they can outsource the handling of
6    an arbitration claim, and that arbitration claim involved
7    the very issues we have been talking about all along,
8    which is what amounts of her condition that has been
9    treated for would be attributable to the motor vehicle
10   accident.
11 Q   Do you think that any of Ms. Davenport's behavior was
12   shocking?
13 A   No, because what I told you about what I thought was
14   shocking was the billing statements that, in fact, were
15   misleading and did not state accurately what was going on
16   or not going on with respect to handling of this case.
17       Was her behavior shocking?  No, I don't think so.  I
18   just think it was disappointing.  It was disappointing
19   that she-- and-- that she didn't comply with
20   Continental's standards.
21       She obviously was very experienced.  She knew what
22   she was doing, and she did not carry the ball correctly,
23   and she certainly did not communicate well, and she did
24   not communicate in accordance with Continental's
25   standards and with Washington's standards.

Page 77

1  Q   In your opinion did Ms. Davenport appropriately monitor
2    the activities of defense counsel?
3  A   I think that she could have communicated better with
4    defense counsel.
5        Certainly she did not communicate well in August of
6    2021.  There were communications she had through the case
7    where she had communicated regularly with him and was
8    under the impression that he was doing the things that
9    she had asked him to do, and he had not.
10 Q   Did she communicate, in your opinion, appropriately with
11   defense counsel to help ensure that the work was being
12   done between September of 2021 and the end of March 2022?
13 A   I think throughout the case she had made attempts to
14   communicate with him.
15       I think her communications accelerated in March of
16   2022.  That was when this file was identified as one
17   which there had been long periods without sufficient
18   activity, and at that point in time she shows a number of
19   communications with Mr. Smith, and thereafter.
20       Between September 2021 and March 2022 there were
21   few, if any, communications with Mr. Smith.
22 Q   Do you agree that one of the tools that Ms. Cohodas
23   (sic.) had at her disposal was the use of the defense
24   counsel guidelines implemented by Continental?
25       MS. LESTER:  You said "Cohodas."

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                        Pages 78..81

Page 78

1            MR. BRIDGMAN:  I misspoke.  Let me
2     rephrase.
3  Q   (By Mr. Bridgman)  Are you aware that Ms. Davenport,
4     among the tools that she had to help work with defense
5     counsel, were Continental's claims or Continental's
6     defense counsels' guidelines?
7  A   The defense counsel guidelines are mostly meant for
8     defense counsel to guide their own behavior, and it's
9     rare, if ever, that a claims person in any situation is
10    involved in dealing with the counsel in terms of whether
11    or not they've communicated.
12        I do not find that she was below the standard of
13    care by failing to bring to Mr. Smith's attention that he
14    may have violated some of the defense counsel guidelines.
15        She should be well aware of what those guidelines
16    are, and it should be self-enforcing by the law firm.
17 Q   Do you know whether or not the defense counsel guidelines
18    require defense counsel to prepare-- defense counsel to prepare
19    written reports analyzing liability, damages, and
20    causation?
21 A   Usually they do.
22        It would not be surprising if that was the case.
23 Q   Do you think that Ms. Davenport could have asked
24    Mr. Smith to prepare such written reports?
25 A   In the normal and customary situation, once an

Page 79

1     arbitration is set and there is expectations that the
2     arbitration will go forward, as there was here, the
3     defense counsel's report, in terms of evaluation, usually
4     comes closer to the beginning of that arbitration and not
5     earlier.
6        The fact that she had picked up or did not pick up
7     anything from him for a number of months prior to the
8     arbitration I don't think falls necessarily below the
9     standard of care.
10 Q   Do you agree, whether it falls below the standard of care
11    or not, that using such tools could be helpful in
12    ensuring that Continental was getting the information it
13    needed from its defense counsel?
14 A   I think the only thing that matters here is whether or
15    not he was within the standard of care.
16        I don't have an opinion as to whether or not it
17    would be useful.
18        My opinions really are limited to the standard of
19    care.
20 Q   How long did it take for Dr. Kenyon to review the medical
21    records and be able to provide an oral report to
22    Mr. Smith?
23 A   Dr. Kenyon got this assignment ultimately as a rush
24    assignment, and she was able to review the medical
25    records and provide an oral opinion to Mr. Smith in July

Page 80

1     of 2022.
2        Her written opinion did not come until much later,
3     October 14th, 2022, and that was the date that the
4     submission, as I understand it, by Continental was due to
5     the arbitrators, and that would not be unusual if she
6     knew that the date was that date and so she completed her
7     report at that point in time.
8  Q   After she did her review, Paul Smith spoke with Cindy
9     Davenport in August about the review, correct?
10 A   I believe it does show that she had a conversation with
11    him at some point in time after review where Mr. Smith
12    explained to her what the report from Dr. Kenyon was, and
13    she made some notations regarding that.
14 Q   And at that point that information was sufficient to
15    adjust the reserves, correct?
16 A   I don't know.
17        That's really an internal matter, but the fact was
18    that her superior, her supervisor, determined that the
19    reserves should be adjusted at that point in time and
20    instructed Cindy to change the reserves, I believe it was
21    to $600,000, and Ms. Davenport did not do so until
22    October 3rd.
23        That violated the internal policies of Continental.
24    Reserves are supposed to be set 30 days, at max, after
25    the information that indicated that they should be

Page 81

1     increased-- and that did not occur.
2        However, those reserves were, in fact, lifted to
3     $1 million, the policy limits, within a week after that.
4  Q   From the time that Continental had the-- from the time
5     that Mr. Smith reported to Continental the results of the
6     review from Dr. Kenyon, would it have been appropriate
7     for Continental to offer to pay to Ms. Cohodas somewhere
8     between $500,000 and $600,000 than go to arbitration over
9     the difference?
10 A   At that point in time, October 3rd, was when, in fact,
11    they determined that the reserves were changed, so that's
12    the date of the reserves, and within seven days the
13    reserves were increased to $1 million and were paid.
14 Q   Yeah, but let's go back to August when Ms. Davenport got
15    the information.
16        Would it have been appropriate, upon receipt of that
17    information, to promptly adjust the reserves and make an
18    offer to Ms. Cohodas for the undisputed amounts?
19 A   The reserves were not adjusted, so there wasn't anything
20    in the reserves at that point in time to be able to do
21    that.
22        She fell below guidelines in failing to change the
23    reserves, so absolutely she did not follow Continental's
24    procedures, but four days-- one week after the increase
25    to $600,000, the reserves were further increased to

Page 82

1    $1 million and paid.

2  Q  Regardless of the reserve part, as of August 2022, when

3       Continental finally had the oral opinions from the

4       expert, would it have been appropriate to offer to pay

5       Ms. Cohodas the undisputed amounts, since they valued it

6       at between $500,000 and $600,000?

7  A  I stand on my prior answer.

8       You can't pay unless you have a reserve increase.

9       No reserves were increased, so there was no payment

10      because the reserves were not increased.

11      Within a week after the reserves were increased,

12      they were increased again to the full policy limits, and

13      that was paid.

14  Q  So let's do a hypothetical.

15      Let's say that Cindy Davenport promptly updated the

16      reserves after the phone call with Mr. Smith about his

17      call with the expert, so that in September of 2022 the

18      reserves had been adjusted as to what would have been

19      consistent with Continental's guidelines to between

20      $500,000 and $600,000.

21      Would it be appropriate at that point in time to

22      offer to Ms. Cohodas to pay her the undisputed amounts?

23  A  And the answer is it's an impossibility because the

24      reserves weren't raised, so I'm in this endless loop, and

25      I can't answer your hypothetical.

Page 83

1  Q  In my hypothetical the reserves have been increased,

2       right?

3       In my hypothetical I want you to assume that as of

4       September, the reserves were increased because in my

5       hypothetical Cindy Davenport did her job and did her job

6       timely.

7  A  But she didn't do her job and she didn't do her job

8       timely, so I find it impossible to imagine that, in fact,

9       she did.

10      Can I ask a question?

11      Customarily I would like to take a break at this

12      point, since we've been going a little over an hour--

13      MR. BRIDGMAN:  Well, this is a good

14  time.  We are just getting ready to go into the next set

15  of opinions.

16      THE WITNESS:  I thought that was the

17  case.

18      Is that okay?

19      MR. BRIDGMAN:  That's fine by me.

20  Let's double check with everyone else, but yes.

21      MR. TODARO:  Yeah, of course.

22          (Recess 11:50 a.m. to 12:01 p.m.)

23  Q  (By Mr. Bridgman)  Okay.  So moving on to the fourth

24  opinion, "Continental acted reasonably in paying

25  Ms. Cohodas the full million dollar policy limits within

Page 84

1  one week after being notified that Ms. Cohodas (sic.)

2  concluded, for the first time, that her symptoms were

3  substantially caused by the April 2015 accident."

4      So I would like to talk with you about that Opinion

5  No. 4, okay?

6  A  Yes.

7      I think you swallowed the fact that it was

8  "Ms. Cohodas's doctors concluded," but that's exactly it.

9  Q  Yeah, I read what you wrote.

10  A  Yes.

11  Q  So I think we covered a bunch of this stuff already, so

12  this may be fairly quick, but with regard to the idea

13  that there were new medical opinions that tied up, for

14  the first time, the causation issue in your mind, just

15  confirming, no one at Continental actually read all of

16  the medical records which the demand that was sent

17  indicated did show causation, correct?

18  A  Not correct.

19      MR. TODARO:  Object to form.

20  Q  (By Mr. Bridgman)  No one employed by the Continental

21  Insurance Company, not as an independent contractor,

22  actually read any of the medical records that accompanied

23  the demand, correct?

24  A  Correct.

25  Q  And no one at Continental ever explicitly told

Page 85

1       Ms. Lester, as counsel for Ms. Cohodas, that they

2       challenged causation, correct?

3  A  I don't know of any communication to Ms. Lester regarding

4       that.

5       I don't know that that is true or not true.

6  Q  In the documents you reviewed, you did not see any

7  documented evidence or testimony indicating that anyone

8  told Ms. Lester that causation was challenged, correct?

9  A  In the reports of Ms. Davenport of communications she had

10      with Ms. Lester, the indication from those reports was

11      that they, in fact, had talked about the medical records

12      availability and her treatment, all of which would go to

13      causation.

14      Whether they discussed the elephant in the room,

15      causation, or not, I don't know, but in that kind of

16      conversation, the issue of causation would not need to be

17      explicitly stated because obviously it is the subject

18      matter of which they are speaking.

19  Q  And once all the medical records were provided and the

20      95-page demand, no one at Continental communicated with

21      Ms. Lester indicating that Continental challenged

22      causation, correct?

23  A  No one from Continental communicated to Ms. Lester after

24      she had sent the demand with the medical records, but

25      those medical records were not conclusive.

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024                                        Pages 86..89

Page 86

1  Q  But, again, no one at Continental even bothered to read
2     the medical records, right?
3  A  Medical records were not reviewed until Dr. Kenyon
4     reviewed them.
5  Q  You reviewed them, but Cindy Davenport never reviewed
6     them, correct?
7  A  You have made that point very clear, and I don't disagree
8     with you on that.
9  Q  And it was her duty, in adjusting the claim, in order to
10    treat her insured correctly, to review the materials that
11    were provided, correct?
12 A  She had an obligation to read those medical records.  She
13    did not.
14 Q  And she had an obligation also, after reviewing the
15    medical records, to communicate with Ms. Cohodas, through
16    Ms. Lester, to indicate if she had issues with causation,
17    right?
18        MR. TODARO:  Object to form.
19        THE WITNESS:  I don't know that that's
20    the case.
21    The causation that was contained in the medical
22    records was clearly sufficiently unclear-- well, "clearly
23    unclear," that's not a good way to say it.  Was
24    sufficiently unclear, that even the medical experts had
25    some difficulty with it.

Page 87

1     For example, Dr. Singh had to be prompted by
2     Ms. Lester to clarify his own opinions regarding the
3     causation, so there are issues as to causation throughout
4     this case.
5     Ms. Davenport did not communicate with Ms. Lester
6     regarding the medical records.  There is no question
7     about that.
8  Q  (By Mr. Bridgman)  Good faith claims handling would
9     require that you have that communication, that open line
10    of discussion, correct?
11 A  There had been an open line of discussion up until the
12    time of the demand.
13    Why Ms. Davenport did not respond to that demand, I
14    don't know.  It violated Continental's standards.  It was
15    not an appropriate response, but she did not respond.
16 Q  And you went into some effort to analyze the declarations
17    that were provided by Ms. Lester in advance of the
18    arbitration, correct?
19 A  I reviewed the declarations that were submitted on
20    October 7th, 2022, yes.
21 Q  Are you aware of whether or not anyone employed at-- so
22    I'm excluding independent contractors.  I am excluding
23    Paul Smith.
24    Are you aware of whether or not anyone at the
25    Continental Insurance Company actually reviewed those

Page 88

1  declarations?
2  A  I don't know.
3  Q  Would it surprise you to find out that no one employed at
4     the Continental Insurance Company actually reviewed those
5     declarations prior to the filing of this lawsuit?
6  A  It wouldn't surprise me in the sense that they went-- the
7     declarations went to counsel, counsel then discussed it
8     with Ms. Davenport, and I believe also with
9     Ms. Davenport's supervisor, so the counsel had made them
10    aware that, in fact, there was certainty here and that
11    the experts used by Ms. Cohodas, her treating physicians,
12    were far better qualified than the eminently qualified
13    but not a POTS expert, Dr. Kenyon.
14 Q  And that was a fact that they knew all along when they
15    hired Dr. Kenyon.
16    Dr. Kenyon told defense counsel, "I am not a POTS
17    expert," correct?
18 A  She told them.  She was a rheumatologist.
19    POTS is an unusual condition, and Dr. Grubb is the
20    person who has made his name in the forefront of POTS,
21    but as a rheumatologist and with the training and
22    education that she had, it was certainly not-- it
23    certainly met the standard of care to retain her as an
24    expert.
25    When you have an unusual condition, you are not

Page 89

1     always able to find someone-- speaking as a defense
2     attorney, you are not always able to find someone who
3     fills that bill, so it would not be below the standard of
4     care to have her, Dr. Kenyon, retained to evaluate this.
5  Q  Do you agree with me that the only source information as
6     to what Mr. Smith told Continental about these
7     declarations is found in the notation in the claim file
8     for the conversation that happened on 10/10-- I'm sorry,
9     10/11/22?
10 A  I thought it was 10/10, but in any event, I don't know
11    that that's the case.
12    The reserves were changed exceptionally quickly, and
13    so it's clear that there must have been information that
14    was received not only from Ms. Davenport but also with
15    respect to her superiors, so that the policy limits could
16    be paid.
17    This was probably the product of the fact that
18    Continental had had this system that had been put into
19    place which tagged the fact that claims were not being--
20    there was no claims activity in the file, so a number of
21    people were looking at this, and so they were able to
22    very quickly get those reserves increased, and that was
23    through the transmission of information.
24 Q  What sources of information do you look to, to see what
25    it is that Mr. Smith told Continental regarding the

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 90..93

Page 90

1  declarations of the two treating physicians?
2  A  What's in the claims file and the information regarding
3      that?
4  Q  You say at the conclusion of this section, regardless of
5      the gaps in communication and the adjustment process and
6      the failures of defense counsel, there's no indication
7      that Ms. Cohodas's doctors and lawyers could have
8      provided that linkage any sooner than they did.
9         Did I read that correctly?
10 A  You did.
11 Q  If Continental had told Ms. Lester, "We need declarations
12     connecting the dots," then there would be nothing that
13     would have prevented Ms. Lester from getting those
14     declarations, that you are aware of, correct?
15 A  I have no idea.
16        That is something completely out of my knowledge or
17     ability to know what she would do or would not do.
18        She prompted her doctor, one of her doctors, to
19     clarify his opinions shortly before she had to submit the
20     pre-hearing declaration of evidence to the Court, and he
21     did, in fact, re-interview Ms. Cohodas, look at the
22     charts, look at further information, and he determined,
23     with much more clarity than before, that, in fact, her
24     condition, her current condition, was a result of the
25     2015 motor vehicle accident.

Page 91

1  Q  So you say, "No indication that Ms. Cohodas's doctors and
2      lawyers could have provided the linkage any sooner."
3         What was preventing them from providing linkage, in
4      your view, sooner?
5  A  I don't know what was preventing them from providing that
6      linkage sooner, but they clearly were going through a
7      process of involving evaluation for claims starting first
8      with whiplash, then talking about hypermobility and
9      conditions that were other issues as well, and it wasn't
10     until the time of the pre-trial submission that the
11     clarity seemed to evolve to the point where they could
12     say, with reasonable medical certainty, that her
13     condition was a result of the motor vehicle accident.
14 Q  Isn't one of the tools that Continental had at its
15     disposal, in terms of investigation, would be to take
16     depositions?
17 A  It's possible.
18        I don't know what parameters were established
19     between counsel with respect to this arbitration, whether
20     it was agreed to submit the medical experts' opinion in
21     just declaration form, which is, in fact, a form of,
22     obviously, legal certainty here in the deposition because
23     it is under penalty of perjury, the same as a deposition,
24     so I don't know what their position was with respect to
25     the arbitration.

Page 92

1         I can't guess otherwise because they were in an
2      arbitration, and this would be a very reasonable thing to
3      do, and the arbitration, in fact, had not taken place, it
4      was scheduled for November 2022, so it's hard to say,
5      but, in fact, they did submit declarations for purposes
6      of that arbitration.
7         I think that counsel probably would not do it prior
8      to having the arbitration, but I don't know that to be a
9      fact.
10 Q  Are you aware that the defendants-- that Continental's
11     materials were also due on 10/7?
12 A  My understanding was that they were due on October 14th
13     not October 7th.
14 Q  Were you aware that they were due on October 7th and
15     defense counsel missed that deadline and asked for a week
16     extension, which was granted?
17 A  That would seem to be what happened.
18 Q  While Continental eventually increased its reserves to
19     a million dollars, isn't it true that Continental's
20     original plan was to try to go to medication and offer
21     $500,000?
22 A  At one point in time that was discussed, but it was
23     obvious they had changed, considering the level-- and I
24     think that was actually Paul Smith's suggestion.
25        I don't know that there was any agreement on that

Page 93

1  particular issue.
2         In any event, other events superseded that, and the
3      submission of the declaration by the doctors really
4      established, to a medical certainty, what Ms. Cohodas's
5      condition was and its relationship to the motor vehicle
6      accident.
7  Q  So it wouldn't be appropriate to offer $500,000 once the
8      declarations came in.  It would only be appropriate to
9      offer the million dollars or to pay the million, correct?
10 A  That's the conclusion that appears to have been reached,
11     and I agree with that.
12 Q  So you have a footnote on Page 14 where you say, "Counsel
13     for Ms. Cohodas insinuates that the current bad faith
14     case, which was filed on October 13, 2022, caused
15     Continental to tender the policy limits.  I have not seen
16     any evidence to support this.  My experience is that the
17     reserving of the file for policy limits, which took place
18     on October 12th, indicates that the limits will be paid."
19        Did I read that correctly?
20 A  You did.
21 Q  So Continental had increased their reserves to $600,000
22     earlier, correct?
23 A  I said a week earlier, and that's correct.
24 Q  And they didn't offer that money to Ms. Cohodas, did
25     they?

Cohodas vs The Continental Insurance Company
Molander, Julia - March 28, 2024

Pages 94..97

Page 94

1 A  They ultimately changed those reserves in very short
2    order and paid a million dollars.
3 Q  But when it was still at 600 and before it went to a
4    million, they didn't offer her the 600, did they?
5 A  The time of this was that the-- the time of the
6    evaluation and the setting of the initial reserves to
7    600,000 did not occur until October 6th, and on
8    October 7th they had the final-- they had the report from
9    the pre-hearing saying that, in fact, Ms. Cohodas's
10   condition was directly attributable to the motor vehicle
11   accident, and so they reserved for a million, and they
12   paid for a million.
13 Q  And they didn't share with Ms. Cohodas until October 14th
14   that they had changed the reserves to a million, correct?
15 A  I see that they were-- that Ms. Cohodas's counsel was
16   informed on that day, yes.
17 Q  And that was the same day that Mr. Smith was informed
18   too, correct?
19 A  I don't know that.
20 Q  So going now to your conclusion, you say, "In my opinion,
21   Continental's overall approach to the handling of the
22   claim for UIM benefits was reasonable, although some
23   mistakes were made."
24      What are the mistakes that were made?
25 A  The mistakes were made that Cindy Davenport did not

Page 95

1    properly communicate with counsel for Ms. Cohodas after
2    she had received the settlement demand of April 1, 2021;
3    that Ms. Davenport did not communicate well with her
4    counsel after he was appointed, failed to communicate
5    back to him regarding the second settlement demand of
6    August 2021; and she failed to communicate within the
7    period of time of September 2021 to March or April of
8    2022-- March of 2022, and she-- this violated
9    Continental's standards.  She was not keeping on top of
10   things.
11      She could be well criticized for not doing this.
12      Why she didn't do this?  I don't know.
13      Her experience level certainly indicated that she
14   should have been on top of this, and it's difficult--
15   it's really just conjecture as to was it personal
16   problems, was it something else, and no one knows.  She
17   says she doesn't know, and these lapses absolutely
18   violated Continental's standards and also violated the
19   regulations in terms of communication or lack thereof.
20 Q  Any other mistakes?
21 A  Those are the mistakes-- the communication mistakes
22   really stand out to me.
23 Q  Now, we kind of went a little bit out of order on my
24   outline, but do you have any other opinions that you
25   haven't shared yet regarding Ms. Owen's report?

Page 96

1 A  Yes, I think there are some issues in terms of her
2    report.
3      I can tell you broadly I disagree that Continental
4    failed to implement reasonable standards for
5    investigation.
6      I disagree with her opinion that Continental failed
7    to respond to relevant communications, except after
8    April 1, 2021, as we discussed.
9      There's several other things within that section
10   that don't seem to really belong with the failure to
11   respond to communications.
12      She has a discussion of reserves, and she has a
13   discussion of evaluation.  We have talked about my
14   analysis of that.
15      She talks about failure to explain.  I disagree with
16   her that there was a failure to explain or that there
17   requires an explanation for the valuation of a particular
18   claim.
19      Failure to investigate, I disagree on that, in that
20   certainly there was an effort to investigate the
21   relationship between Ms. Cohodas's evolving condition and
22   the motor vehicle accident that was initially impeded
23   because of the unavailability of records in the control
24   of Ms. Cohodas and her attorney.
25      I disagree that-- she has several other opinions

Page 97

1    under that label that don't seem to really have anything
2    to do with failure to investigate, that I disagree with.
3      She concludes there was an unreasonable denial of
4    benefits.  I disagree with that.  I don't think that
5    there was any unreasonable denial of benefits.  Even
6    though the benefits were denied, there was an arbitration
7    scheduled to resolve the issues of causation and find
8    whether or not there might be obligation to pay and in
9    what amount, and that there had never been a denial, and
10   you and I have discussed that.
11      I really disagree that Continental forced its
12   insured into litigation.  I think that this was entirely
13   a determination by counsel, it was one day after the
14   initial settlement offer expired, that this was
15   determined that the arbitration needed to take place, and
16   we have also discussed that as well.
17      I think we have covered pretty much what my
18   disagreements are with respect to her report.
19 Q  And while you disagree with her on the failure to
20   investigate, we do agree that any investigation that was
21   eventually undertaken was not timely, correct?
22 A  I don't think that I disagree with that-- I mean, that I
23   agree with your position.
24      I think that the investigation, the critical
25   investigation, was how you deal with the doctors' final

Page 98

1  ==reports that with medical certainty really showed that==
2  ==there was a direct connection and that they were willing==
3  ==to state that under penalty of perjury that there was a==
4  ==reasonable certainty with that medical connection.==
5      Her communications are at fault, but I'm not sure
6  that I would agree that the-- that an investigation or
7  a-- you know, into the medical records earlier than that
8  would have arrived at any different conclusion than they
9  did on October 7th, 2022.
10             MR. BRIDGMAN:  Okay.  So what I would
11  like to do now is take a short break, confer with
12  Counsel, and then I'll come back, but if you guys want,
13  you can take-- you can take a full ten minutes, but we
14  will probably be back in five, and if our cameras turn
15  on, you are welcome to come back, but if you are doing
16  something, that's fine too.
17             THE WITNESS:  Okay.  Thank you.
18             MR. BRIDGMAN:  Off the record.
19             (Recess 12:29 to 12:38 p.m.)
20  Q  (By Mr. Bridgman) Ms. Molander, have you been asked to
21  perform any other work, beyond the report that you've
22  done?  In other words, are you planning on supplementing
23  the report, doing additional investigation, et cetera?
24  A  I do not, other than reading Ms. Owen's report, and I
25  have already done that.

Page 99

1  Q  You have done that.  I asked you the questions about it?
2  A  Yes.
3  Q  This is the standard cleanup stuff.
4      I am just making sure that you don't anticipate
5  giving any opinions that are different than what you have
6  either testified about, especially with Ms. Owens, or
7  what is contained in your written report.
8  A  That's correct.
9  Q  And you don't intend, at least right now, to do any other
10  investigation work, interviews, et cetera, to gather more
11  information related to your opinions in this case; is
12  that correct?
13  A  That's correct.
14             MR. BRIDGMAN:  Okay.  Those are all of
15  the questions that I have.  Thank you for taking the time
16  to be with us today.
17             MR. TODARO:  Thank you, no questions.
18             (Deposition concluded at 12:39 p.m.)
19             (Signature reserved.)
20
21
22
23
24
25

Page 100

1  STATE OF WASHINGTON )     I, Terilynn Simons, CCR, RMR, CRR
                        ) ss a certified court reporter
2  County of Pierce     )   in the State of Washington, do
                            hereby certify:
3
4      That the foregoing deposition of JULIA MOLANDER was
5  taken before me and completed on March 28, 2024, and
   thereafter was transcribed under my direction; that the
6  deposition is a full, true and complete transcript of the
   testimony of said witness, including all questions, answers,
7  objections, motions and exceptions;
       That the witness, before examination, was by me duly
8  sworn to testify the truth, the whole truth, and nothing but
   the truth, and that the witness reserved the right of
9  signature;
10      That I am not a relative, employee, attorney or counsel
11  of any party to this action or relative or employee of any
   such attorney or counsel and that I am not financially
12  interested in the said action or the outcome thereof;
13      That I am herewith securely sealing the said deposition
   and promptly delivering the same to Kari Lester.
14
       IN WITNESS WHEREOF, I have hereunto set my signature on
15  the 29th day of March, 2024.
16
17
18
19             _____
               /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR
20             State of Washington CCR #2047
               My CCR certification expires on 7/7/24
21
22
23
24
25

Page 101

2
3  April 04, 2024
4  NAME OF CASE:        Cohodas vs The Continental Insurance Company
5  DATE OF DEPOSITION: 03/28/2024
6  NAME OF WITNESS:    Julia Molander
7
8
9
   This letter is to advise you of the following:
10
       Signature was reserved.  The Affidavit and
11     Correction sheet are being forwarded to you in
       electronic form.  Please have the deponent
12     review the transcript, note any corrections on
       the corrections page, and return the signed
13     affidavit and correction page to us within
       30 days of this notice.  According to Court
14     Rule 30(e), the deposition affidavit should be
       signed within thirty (30) days or signature is
15     considered waived.
16
17
18
19
20
21
22
23
24
25