# EXHIBIT 6

**Julia Molander**
**JAMolander Consulting LLC**
718 23rd Avenue
San Francisco, CA 94121
jamolander@sbcglobal.net
415-860-5725

March 15, 2024

VIA E-MAIL

Anthony Todaro
Lianna Bash
DLA Piper
701 5th Avenue, Suite 6900
Seattle, Washington   98104-7029
anthony.todaro@dlapiper.com
lianna.bash@dlapiper.com

Re:     *Samantha Cohodas v. The Continental Insurance Co.,* 2:22cv01561 RAJ
        USDC Western District of Washington at Seattle

Dear Mr. Todaro and Ms. Bash,

You have requested that I review the material in this matter and provide my expert opinion regarding whether the Continental claims handling regarding the claim of Samatha Cohodas meets industry standards for uninsured motorists claims.  Based upon my experience and qualifications, I conclude the following:

1.      Continental had in place good procedures for claims handling that met industry standards and Washington requirements, including claims manuals that were regularly updated and a system to manage claims that appropriately assigned and reviewed claims according to the level of expertise of the claims handler and severity of the damages sought by the claimant.  In my opinion these procedures were consistent with the custom and practice of the insurance industry.

2.      Continental appropriately assigned Ms. Cohodas's claim to Cindy Davenport, a high-severity claims adjustor with more than 20 years' experience.  From June 17, 2015, when Ms. Cohodas's counsel first made contact with Continental, to April 1, 2021, when the first policy limits demand was transmitted to Continental, the claims handling appeared to be consistent with the custom and practices of the insurance industry.

3.    For more than three years, Ms. Davenport requested medical records from counsel for Ms. Cohodas.  These records were promised by counsel for Cohodas but not received until April 2021, when 2500 pages of medical records were produced as an attachment to the demand for the UIM policy limits.  Counsel for Ms. Cohodas also filed a motion to send the matter to arbitration, which is customary when the causation and amount of damages is in dispute.  Ms. Davenport appropriately retained counsel from Forsberg & Umlauf to represent Continental in the arbitration and to retain an expert to review the medical records.

4.    The arbitration was set for November 2022.  On October 7, 2022, counsel for Ms. Cohodas submitted a pre-hearing statement with two treating physicians' declarations.  The physicians' statements, for the first time, unequivocally linked the symptoms reported by Ms. Cohodas to the accident of April 2015.  Within days of receiving this information, Continental raised its reserves to policy limits and agreed to pay the full limits.  The limits were paid in full on October 28, 2022.  In my opinion Continental met the standards for proper claims handling in paying the limits promptly after receiving full information.

## QUALIFICATIONS

For more than 40 years as a practicing attorney, I have represented insurers, reinsurers, agents and insureds in complex coverage matters in California, the Pacific Northwest, and nationwide.  My experience encompasses a wide variety of insurance types and issues, including uninsured motorist and underinsured motorist (UIM) matters. In my practice I have been involved in at least two dozen UIM cases where I advised on coverage and handling the losses.  I have represented insurers in hundreds of coverage and bad faith cases in state and Federal courts, including King County.

I have lectured frequently on various aspects of claims handling, bad faith and state insurance claims-handling regulations, at national seminars and on-site presentations for insurers.  These include programs sponsored by the American Bar Association, the Defense Research Institute, the Insurance Roundtable for insurance executives, the Property & Liability Research Bureau, the American College of Coverage Counsel, the Litigation Council of America, the Northern California and Nevada Defense Counsel, and the Kings County CPCU chapter.  I have presented at annual training sessions for insurance company employees on Fair Claims practices with updates on current issues.  I am familiar with the Washington state regulations and statutes regarding fair claims practices.

During the course of my practice I have reviewed many dozens of claims manuals issued by insurance companies to train their employees on claims handling procedures.  I have contributed written material to claims manuals on various issues including regulatory compliance and bad faith avoidance.

2

From time to time I have also been retained to conduct audits of insurance files for compliance purposes and in insurance litigation. I have reviewed thousands of claims files over the course of my practice from dozens of insurance companies and from nearly every state in the Union.

As a result, I have detailed knowledge as to insurance industry customs, standards, and practices. I have been retained in dozens of matters as an expert consultant on insurance claims handling and strategic litigation issues, in insurance disputes in the United States, Canada and the UK. I have testified as an expert witness on claims handling in at least 20 cases in state and Federal matters.

For more than 25 years I have been rated AV Pre-eminent by my peers and have been recognized as a "Super Lawyer" since 2004 and a "Best Lawyer" since 2011. I am a Fellow of the American College of Coverage Counsel, whose elected membership consists of the top insurance attorneys in the United States and Canada. I served as the first woman to chair the 1400-member Association of Defense Counsel of Northern California and Nevada (1995-1996); I was chair of the California State Bar Insurance Section (2003-2005); I headed the Defense Research Institute's national Insurance Law Committee (2006-2008); I was elected a fellow of the Litigation Counsel of America in 2009. I have been selected since 2007 for presentation in the International Who's Who in Insurance and Reinsurance law.

A copy of my current curriculum vitae, which includes a summary of the testimony I have given as an expert in the last four years, is attached as Appendix A. An index of the materials I relied upon in rendering my opinion is attached as Appendix B.

I am being compensated for my time in this matter at the rate of $525 per hour.

**OPINIONS**

**1.     Continental's Claims Handling Guidelines, Training and Administration Met Insurance Industry Standards and Washington Requirements**

There are several areas of claims administration to review in order to determine if there are systemic issues with the company: claims procedures, training, management structure, record-keeping, and hiring. In doing so I found no systemic issues in CNA's management of this claim.

In my view, CNA meets insurance industry standards in its claims manuals that were in effect during the time the Cohodas claim was pending. CNA's practice is to try to set claims standards, particularly in terms of time deadlines, to match the most restrictive of the States in which it has claims. (Strait at 194-195) The claims manuals reflect these standards and meet the custom and practice of the industry for timeliness of response and other aspects of claims handling. These manuals reflect the best practices in the insurance industry.

3

CNA also meets the custom and practice of the industry in its regular training of its staff.  The CNA insurance professionals, managers and even top claims management regularly receive trainings on claims handling, including fair claims practices and UM and UIM claims.  (Rawlins at 14-15; Henderson at 17; Strait at 195-196; CIC003268; CIC004472; CIC007054- CIC007136)

CNA meets the custom and practices of the insurance industry in mandating that all significant communications be maintained in the electronic claims file, including written correspondence.  CNA employees are instructed regularly to keep all communications in these files.  Entries that are made cannot be erased by the claims professional.  (Strait at 17; CIC001175)

CNA upgraded its computerized handling in 2022.  The company implemented a new claims monitoring tool that flagged files in which there had been no activity for several months.  (Rawlins at 24-26)  This cutting edge tool available to management was an advance in claims handling that exceeded the standards of the insurance industry.

The management structure of CNA also reflects appropriate practices in the insurance industry.  The top claims executive of the General Liability/Auto division is the Vice President of Claims.  During the relevant time period, Brian Rawlins served as Vice President of Claims.  He previously had been AVP of General Liability/Auto for five years.  (Rawlins at 7-10, 27-28, 33)  Mr. Rawlins graduated from Illinois Wesleyan University in their risk management program, and previously worked for Nationwide and Travelers.

Reporting to Mr. Rawlins is Heather Henderson.  Ms. Henderson is an experienced professional who was promoted in October 2021 to Assistant Vice President of Field Liability Claims.  As Assistant Vice President she supervises 40 people, divided into 5 teams. She has been with CNA in a variety of roles since 2007.  (Henderson at 11)  Ms. Henderson's team handles high severity cases up to a limit of $2 million. (Henderson at 16)  She is a Certified Insurance Counselor ("CIC") and receives continuing education yearly to maintain that license.  (Henderson at 11)

One of Ms. Henderson's teams is managed by Walter Strait, a claims director/manager.  (Henderson at 19)  Mr. Strait has worked for CNA for 5 ½ years and previously worked in claims for Travelers and Safeco.  He assumed the position of claims manager/director in November 2021. In July or August 2022, Walter Strait was assigned to be the claims manager for the team that included Ms. Davenport when CNA reorganized its claims teams and his predecessor, Brad Barton, was made manager/director of construction defect claims.  (Henderson at 19-21)

CNA's hiring practices are appropriate within the customs and practices of the insurance industry.  CNA generally hires experienced claims professionals to handle claims, and assigns them according to expertise and level of risk.  (Strait at 182-184)  This is why Cindy Davenport, an experienced claims professional, was assigned to the unusual UIM claim by Ms. Cohodas.  The Vice President of Claims for General Liability

and Auto, Brian Rawlins testified that he worked with the finance department to make sure his claims team was adequately staffed.  Between March 2021 and October 2022, the team was correctly staffed based on case count, although there were a few open positions. (Rawlins, 74-75)

### 2.    Continental's Handling of Ms. Cohodas's Claims, for the Time Period between the Accident and the Policy Limits Demand, Met Industry Standards

This matter arose from an accident that took place on April 24, 2015.  Alyssa Silver was driving a Range Rover that belonged to her father's business, Pro Golf Discount.  Her passenger was Samantha Cohodas, her best friend and former roommate at San Diego State.  (Cohodas at 91:9-18)  While the vehicle was stopped in traffic, the Range Rover was rear-ended by a Honda Civic.  The Range Rover was pushed into the car in front of it.  Ms. Cohodas felt some pain in her neck an oncoming headache but declined any transport to the hospital.[1]  (Cohodas at 93:4-6, 94:1-5)  The Range Rover was driveable, so Ms. Cohodas had Ms. Silver deliver her to her home where she lived with her parents.  (Cohodas at 94:1-13)   She consulted a doctor four days later. (COHODAS000002-COHODAS000003)

The Range Rover was insured by Continental Insurance Company under a commercial auto policy no. 2093811973 issued to Pro Golf Discount, Inc.  (CIC000002) The policy included property damage for the vehicle.  It also included underinsured motorist (UIM) coverage to a limit of $1 million for personal injuries suffered by the occupants of the vehicle that occurred because of an accident involving the insured vehicle.  This coverage extends to any occupant, regardless of their relationship to the insured company.  (CIC000002 at CIC000033)

Ms. Silver reported the accident to Continental on April 29, 2015, noting that the Range Rover had visible property damage.  (CIC000087)  She made no claim for injuries to herself.  She did not mention that her passenger was injured, nor did the police accident report.  The claim for property damage was acknowledged by Continental on May 4, 2015.  (CIC000100)  Continental spoke with Ms. Silver on May 6, 2015, and noted that Ms. Silver did not work for the insured business, Pro Golf Discount, Inc., but she had permission to drive the vehicle.

On May 11, 2015 Samantha Cohodas called Continental seeking information about whether she was entitled to PIP or MedPay coverage under the Pro Golf Discount policy.  (CIC001024)  On June 17, 2015, Continental sent Ms. Cohodas a letter informing her that MedPay and PIP were not available under the policy.  (CIC001215) On September 18, 2015 an attorney representing Ms. Cohodas contacted Continental regarding Ms. Cohodas's claim for PIP coverage.  (CIC001219)  On September 28, 2015,

---

[1] Two weeks prior to the accident, Ms. Cohodas had seen a doctor for neck pain and neuropathic pain resulting from a prior head trauma and for  brain fog. (COHODAS002776)  Ms. Cohodas also was treated for neck pain and headaches as a result of accidents in 2011 and in 2014.  (COHODAS002739; COHODAS002726)

5

Continental provided the attorney with a copy of the letter sent to Ms. Cohodas, explaining that the policy did not provide such coverage. (CIC001220) In my opinion, the responsiveness of Continental met industry requirements.

Three years later, on February 28, 2018, attorney Kari Lester contacted Continental by faxed letter, advising that she now represented Ms. Cohodas. (CIC000104) She too inquired regarding the availability of PIP and MedPay coverage for Ms. Cohodas. (CIC000104) Continental responded that no such coverage was available in the Pro Golf policy, and provided attorney Lester with a copy of the June 17, 2015 letter. (PLAINTIFF000006) This response was consistent with good claims handling in my opinion.

On April 9, 2018, attorney Lester contacted Continental by fax letter and stated that her client now was seeking uninsured motorist benefits. (CIC000108) She requested a full copy of the commercial auto policy issued to Pro Golf Discount. The case was assigned to Cindy Davenport, a senior adjuster with more than 20 years' experience, specializing in high risk claims. Two days later, on April 11, 2018, Cindy Davenport of Continental spoke with attorney Lester and followed up with an email acknowledging the request. (PLAINTIFF000012) In my opinion, Ms. Davenport's response complied with the custom and practice of the industry.

On April 13, 2018, Ms. Davenport sent attorney Lester a copy of the commercial auto policy declarations, which stated that policy provided uninsured motorist benefits up to the amount of $1 million. (PLAINTIFF000015) In my opinion, Ms. Davenport's timely production of declarations pages for the policy meets the custom and practice of the insurance industry. The declarations pages give the unique or "manuscript" information that informs the recipient of the specific coverages purchased by the business. In contrast, the pre-printed forms are not unique to the insured and often must be assembled by a clerk based on the information in the declarations. The policy itself usually is in the possession of the insured, or in the case of a commercial entity, the entity's broker.

From April to October 2018, Ms. Davenport and Ms. Lester continued their exchanges regarding policy information. In July 2018, Davenport requested the status of the case against the adverse driver, the policy limits, the condition of Ms. Cohodas and the medical expenses to date. (PLAINTIFF000025) Lester responded in late July 2018 regarding the settlement of the adverse driver for the driver's $100,000 policy limits. (CIC000727) In August 2018 Davenport responded that she approved the settlement with the driver, provided a copy of the Continental policy and requested Ms. Cohodas's personal policy information. (PLAINTIFF000036) Lester responded and provided a copy of Ms. Cohodas's personal policy. (PLAINTIFF000112) In August 2018 Davenport also obtained and forwarded a certified copy of the same policy information she previously sent. (PLAINTIFF000179) In my opinion, the responses of Ms. Davenport to the inquiries were consistent with good claims handling in the custom and practice of the insurance industry.

6

For an additional two and a half years Ms. Davenport sought the medical records and medical status of Ms. Cohodas. (CIC001089-CIC001113)  In her August 7, 2018 correspondence, Ms. Lester informed Davenport that her client had more than $100,000 in medical expenses but the invoices were not enclosed. (PLAINTIFF000112) On June 17, 2019, Lester informed Davenport that she had no further information regarding Ms. Cohodas's medical condition. (CIC001101-1102)  Davenport again requested an update on Ms. Cohodas's condition on March 31, 2020. (PLAINTIFF000349)  Lester responded that the bills were over $100,000 and that Lester would have her assistant send the medical records. (PLAINTIFF000350)  This did not happen.

Ms. Davenport continued to ask for status updates and medical records.  On June 25, 2020, Ms. Davenport inquired from Ms. Lester as to her client's medical status and requested copies of the medical records or alternatively, an authorization for her to obtain them. (PLAINTIFF000356)  Ms. Lester replied on June 26, 2020 that her client was still being treated for POTS caused by the collision. (PLAINTIFF356)  She stated that she was getting the medical records together and asked if Davenport would like these by CD or sharefile. (PLAINTIFF000356)  Ms. Davenport replied on June 26 that she would like a sharefile. (PLAINTIFF000356)  She did not receive the records.

Ms. Davenport followed up on February 2, 2021 that she had not received any medical records. (CIC004469)  She inquired on the condition of Ms. Cohodas. (CIC004469)  Ms. Lester responded that she had just gotten an update and that she would send the medical records. (CIC004469)  On February 3, Ms. Davenport asked Ms. Lester whether Ms. Cohodas was still being treated for her condition.  Ms. Lester responded on March 17, 2021 that she was preparing a demand and would forward the medical records with the demand. (CIC004469)

In my opinion, Ms. Davenport acted within in the custom and practice of the industry with periodic prompts to Ms. Lester to provide the records of Ms. Cohodas. These records were within the control of counsel for Ms. Cohodas, who chose not to share the records during this two and a half year time period and showed no urgency in doing so.  The records were essential for evaluation of Ms. Cohodas's claim because her POTS condition as a result of the accident was unusual and differed from the more typical whiplash expected from such an accident.  Ms. Davenport's interactions with Ms. Cohodas's counsel during this time period were respectful and appropriate.

**3.      From April 2021 to the Conclusion of the Claim in October 2022, Continental Acted Responsibly in Hiring Counsel and Retaining a Medical Expert**

On April 1, 2021, six years after the accident, counsel for Ms. Cohodas transmitted a 95-page time-limited demand letter with nearly 2500 pages of Ms. Cohodas's medical records. (CIC004351; CIC004348)  These were the first medical records Continental received, after nearly three years of requesting them from Ms. Cohodas's counsel.  The demand, expiring in 20 days, was for the $1 million limits of Continental's UIM policy.  Ms. Davenport did not respond to the demand, or a

subsequent one, in direct contravention of CNA's established policies.  She has no explanation for this lapse, nor for her subsequent lapses.  (Davenport at 100-101)

My experience is that time-restricted policy limit demands are not typical in UIM cases, unlike third party liability cases.  With a third party liability case, an insurer who fails to timely respond to a reasonable policy limits demand may face serious consequences. This may include, in most jurisdictions, potential liability on the part of the carrier for the entire amount of the judgment or stipulated judgment through settlement.  The rationale given for the third-party rule is that the insurer's duty to defend its insured includes the duty to settle.

In contrast, UIM cases are considered first party matters where time limited demands do not trigger excess liability.  The issue to be resolved is whether the scope and amount of damages suffered by the insured were caused by negligence of the underinsured motorist, up to the limits of the insured's own policy.  I am not aware of time-restricted policy limits demands in a UIM case where causation has yet to be established.

With the demand, counsel for Ms. Cohodas also sent a notice of intent to arbitrate to Cindy Davenport at Continental.  (CIC004444)  Twenty days later, after the time-limited demand expired, Ms. Cohodas, through her counsel, filed a motion in state court to arbitrate the scope and causation of damages.[2]  (CIC004146)  Arbitration is required by the UIM policy to establish the liability and/or the damages caused by the underinsured driver if these are reasonably in dispute.  (CIC000001)  In my experience the fact that Cohodas's counsel initiated the arbitration process may indicate uncertainty about their position on causation.

On July 19, 2021, Ms. Davenport appointed Forsberg & Umlauf to represent Continental in the arbitration, and the matter was assigned to Paul Smith of the firm.  (CIC001081)  Mr. Smith made an appearance in the arbitration proceeding on August 6, 2021.  (ForUm-CIC000079)  Mr. Smith is a seasoned trial attorney who has represented Continental and other CNA companies in dozens of cases.  (Smith at 9-10)  Mr. Smith testified in his deposition that he represented the company, not Ms. Cohodas, for purposes of the arbitration and was not retained to adjust the claim.  (Smith at 10-11)  This is appropriate in underinsured motorists cases; counsel typically is retained to represent the UIM insurer in establishing the liability of the underinsured motorist for damages exceeding the amount of the underinsured driver's liability insurance.  In my opinion, Continental's retention in this matter of a reputable defense firm such as Forsberg & Umlauf meets the custom and practice of the insurance industry.

---

[2] Counsel for Ms. Cohodas criticizes Ms. Davenport for not responding to the arbitration demand nor attending the hearing in which the court ordered arbitration.  Neither are necessary if uncontested.  However, Ms. Davenport did not follow CNA guidelines when she failed to respond.

On August 31, 2021, Ms. Lester sent a letter to Mr. Smith renewing her demand for Continental's $1 million policy limits, with a time limit of September 10, 2021.[3] (CIC004129)  Between September 1 and September 10, Mr. Smith sent multiple emails and left messages for Ms. Davenport regarding the demand, to which she failed to respond.  (CIC004460, CIC004128, CIC004119, CIC004122)  Ms. Davenport offered no explanation for her failure to respond to these communications, and her failure to respond to Mr. Smith's communications violates Continental's policies.  On September 10, he sent a letter to Ms. Lester acknowledging the receipt of the demand, and indicating that Continental would like to mediate once it had more information regarding Ms. Cohodas's symptoms.  (CIC004461)

The arbitration was ultimately scheduled to take place in November 2022.  Mr. Smith initially proposed a September 2022 arbitration date, but the arbitration was delayed until November 2022 to accommodate scheduling conflicts of others.  (ForUm-CIC000850)  Continental never instructed Mr. Smith to delay the arbitration proceeding.  (Smith at 118-120)

Mr. Smith also sought and obtained permission from Ms. Davenport to retain Dr. Christi Kenyon as a medical expert on the medical condition of Ms. Cohodas.  (CIC004236)  Dr. Kenyon is a well-known Seattle rheumatologist who is Board-certified in rheumatology and internal medicine.  She attended Yale University as an undergraduate and University of Washington Medical School.  She specializes in patient care for individuals with autoimmune and other complex diseases, including chronic pain and lupus.  Mr. Smith recommended her retention on September 9, 2021; Ms. Davenport gave permission to Mr. Smith on September 20, 2021 to retain her.  (CIC004119)  Although Dr. Kenyon informed Mr. Smith that she was not an expert on POTS, her specialty as a rheumatologist treating unusual diseases would make her an appropriate choice for an expert.

Shockingly, despite having received permission to retain Dr. Kenyon, Mr. Smith did not do so for ten months.  (ForUm-CIC000768.)  He never told Ms. Davenport that he had not retained Dr. Kenyon, even though Ms. Davenport made a number of inquiries concerning Dr. Kenyon's opinions, in April, May and June of 2022.  Mr. Smith falsely represented on more than one occasion that Dr. Kenyon was reviewing medical records and working on her opinion.  (ForUmCIC001070-1073)  In fact, Mr. Smith performed very little work on this file from September 2021 to July 2022, although he regularly billed Continental for his work.  (CIC007484, CIC007494, CIC007501, CIC007506)  His

---

[3] Again, the time-limited demand is not typical in UIM cases.  Regardless of the demand terms, Continental had an obligation to pay the UIM policy limits of $1 million within a reasonable period of time after Continental received information from Ms. Cohodas that her condition was caused by the rear-end accident.  The receipt of this information did not occur until October 7, 2022, and the policy limits were paid shortly thereafter.

explanation is that he was working on two UIM cases with similar facts, and mistakenly billed Continental for the work on his other file.  (Smith at 71-72, 105-112)[4]

At some point in time in mid-2022, Mr. Smith realized that his office had never retained Dr. Kenyon and never obtained Ms. Cohodas's medical records.  Despite testifying that he was surprised when he learned the firm had not actually obtained an expert or medical records (Smith at 72), Mr. Smith never informed Continental of this error.  Not only did Mr. Smith not tell Continental that he had never obtained medical records, in what appears to be an attempt to hide his mistake, Mr. Smith took the unusual step of reaching out to Plaintiff's counsel to obtain the records that had been provided to Continental over a year prior.  (ForUm-CIC_000806) Continental therefore had no way of knowing that an error had occurred or that Mr. Smith had misrepresented the work he was performing with respect to Ms. Cohodas's file.

On July 1, 2022, Paul Smith's office finally retained Dr. Christi Kenyon and sent her the medical records that Ms. Lester previously sent with the policy limits demand.  (ForUm-CIC000768)  Dr. Kenyon reviewed the records of Ms. Cohodas in July 2022, well in advance of the scheduled arbitration.  (CIC004107)  She reported orally to Mr. Smith on July 19, 2022 that her preliminary opinion was that Ms. Cohodas did not suffer from POTS but that she had some of the same symptoms.  (ForUm-CIC002009)  She followed up with an article sent to Mr. Smith on July 19, 2022, and asked if he needed any follow up.  (ForUm-CIC001083)  She declined to take an IME of Ms. Cohodas, stating that the records were sufficient.  (ForUm-CIC002009)  Dr. Kenyon submitted her final written report to Mr. Smith on October 14, 2022, the day Continental's pre-hearing statement of proof was due.  (CIC003337)  In my opinion, Continental and Mr. Smith's retention of Dr. Kenyon to provide insight into Ms. Cohodas's medical condition met the industry custom and practices of handling UIM claims.

On August 3, 2022, Mr. Smith discussed Dr. Kenyon's reported findings with Ms. Davenport.  (CIC001065-1066)  In her notes of the conversation, Ms. Davenport recognized that Ms. Cohodas was an eggshell plaintiff and re-evaluated the case as having a potential exposure of between $500,000 and $600,000.  (CIC001065-1066)  On October 3, 2022, Ms. Davenport raised the reserves to $600,000 based on an exposure analysis and medical bills approximating $150,000.  (CIC001062, (CIC004036)  She opined that "medical review determined that this case would be difficult to defend against POTS due to the other issues going on that the accident has aggravated the plaintiffs neck and has some of the same symptoms as POTS."  (CIC004036)  Although under Continental's procedures Ms. Davenport should have increased the reserves within 30 days of receiving the expert's oral opinion (CIC001175), it is my opinion that Ms.

---

[4]At least one of the false billing entries appears to affirmatively misrepresent that Mr. Smith was reviewing Ms. Cohodas's medical records.  He states that he "review[ed]/analyze[d] approx. 400 additional pages of plaintiff's treatment history and POTS symptoms to incorporate into mediation brief (1.3)" on October 27, 2021 – a date on which Smith had no medical records and no mediation was scheduled.  (CIC007503)

Davenport appropriately raised the level of the reserves in light of Dr. Kenyon's opinion regarding the uncertainty of causation.

In summary, it is my opinion that Continental acted appropriately in retaining Paul Smith from Forsberg & Umlauf as defense counsel, in retaining a medical expert to review Ms. Cohodas's records and offer an opinion on causation, and in increasing reserves based on the expert's opinion.

That being said, Mr. Smith made multiple missteps in his handling of Ms. Cohodas's file including:

- Delaying ten months in obtaining Ms. Cohodas's medical records;
- Delaying ten months in retaining Dr. Kenyon;
- Inaccurately representing to Ms. Davenport that he was working to obtain all medical experts and was working with the medical expert to obtain her opinion;
- Invoicing Continental for work reviewing Ms. Cohodas's medical records that did not take place; and
- Failing to inform Continental when he discovered that mistakes had been made.

Mr. Smith represented Continental, not Ms. Cohodas, with respect to this matter, and his misrepresentations and concealments violated his duty to Continental.  Continental reasonably relied on Mr. Smith's misrepresentations, and it could not have been foreseeable to Continental that its outside counsel from a reputable firm would not be truthful about the work he was performing.

**4.    Continental Acted Reasonably in Paying Ms. Cohodas the Full $1 Million Policy Limits Within One Week After Being Notified that Ms. Cohodas's Doctors Concluded, for the First Time, that Her Symptoms Were Substantially Caused by the April 2015 Accident**

In early 2022 CNA upgraded its computer systems so that claims professionals had new tools to track the frequency of activity on files.  Brian Rawlins, CNA's vice president of claims, testified that with this new system he and his team were able to identify claims that were inactive and bring these claims to the attention of the managers for follow up.  (Rawlins at 25, 61)

After she was promoted to the AVP position, Ms. Henderson worked on a six-month plan to develop a dashboard in the new computer system that would identify claims handled by her claims professionals that had no activity for 90 days or more. During that ongoing review the Cohodas claim came to her attention on April 1, 2022. (Henderson at 27-28)

On April 4, 2022, Ms. Henderson participated in a phone call with Ms. Davenport and Brad Barton regarding the claim and lack of activity.  (Henderson at 29)  She learned in the phone call that there was a serious question as to whether the POTS symptoms

11

alleged by Ms. Cohodas were caused by the rear-ender accident of April 24, 2015. Ms. Henderson kept the claim on diary because if Ms. Cohodas's POTS condition was caused by the accident, it could fall within her authority. Her impression from the call is that Continental needed the medical records, defense counsel's analysis and an expert evaluation regarding how the POTS was related to the auto accident. (Henderson at 32)

After the phone call, Ms. Henderson continued to flag the claim for review because she wanted to keep informed of its status until the claim was resolved. She did this for multiple dates including April 22, May 2, May 13, July 11, July 20, August 10, August 26, September 2, September 6, September 13, September 30. (Henderson 40-56; CIC004513) On August 25, 2022, Ms. Henderson requested that Mr. Strait, who was newly assigned as Ms. Davenport's manager, look at the Cohodas claim. (CIC001065) He did so, and requested that Ms. Davenport review the new information received from the expert and update her reserve analysis. (CIC001065)

The medical records sent by Ms. Cohodas counsel with the April 1, 2021 demand letter, and supplemented in a further production in mid-2022, included the records of more than a dozen persons who provided treatment for her conditions after April 24, 2015, including physicians, acupuncturists, and physical therapists. As of April 1, 2021, Ms. Cohodas had more than 100 sessions with her providers. Although her doctors were numerous, and well-regarded, her medical records did not conclusively establish that the accident caused her symptoms.

In the October 7, 2022 pre-hearing report, Ms. Cohodas's lead treating physicians rather dramatically changed their assessment of the relationship between the accident and Ms. Cohodas's current POTS symptoms. Both Dr. Virtaj Singh and Dr. Blair Grubb expressed during their treatment that Ms. Cohodas might have an underlying condition that at least partly explained a good part of her symptoms. (COHODAS002897, COHODAS002905) But in their October 7, 2022 affidavits, both physicians testified that they had "a reasonable degree of medical certainty" that her present symptoms were the result of the April 24, 2015 accident.

In his initial assessment of January 13, 2017, Dr. Virtaj Singh reported that Cohodas was referred by her primary physician for therapy following the April 24, 2015 rear-end collision. (COHODAS001558) He states "she reports that her therapist at one point did an adjustment on her, after which she developed severe pain, became very emotional, and started crying. She reports that she has had a daily headache since that time [and] has been plagued with issues of 'brain fog'." He further notes that she "has some underlying ligamentous laxity and I do believe there is probably some instability within her upper cervical facet segments.... This could certainly be the triggering cause of her post whiplash headaches. Complicating matters however is I believe the patient has developed a compensatory dystonia, although I am not entirely sure that the dystonia is not driving the instability within her neck." This uncertainty as to causation is echoed in his reports of subsequent appointments, including Ms. Cohodas's visits of March 20, 2017; April 26, 2017; May 15, 2017; June 15, 2017; May 10, 2018; June 21, 2018; July 20, 1018; January 30, 2019 and May 30, 2019. (COHODAS001558-1603)

12

Three years later, Dr. Singh reported differently.  In his May 31, 2022 report, Dr. Singh wrote:  "The complicated aspect of this case is that the patient was very clearly dealing with similar issues of craniocervical instability before the collision in question. There are notes dating back to her evaluations with Dr. Garrett Hyman as well as her physical therapy notes back to 2011-2012 in which she was having similar symptoms. From my review of the records, those symptoms were stable and well controlled before the collision in question and that her symptoms have significantly worsened and remain worsened since the collision in question.  Overall, I believe the collision in question likely aggravated a pre-existing stable condition."  (COHODAS002897)

Two months later, at the request of Ms. Cohodas's counsel (COHODAS002905), Dr. Singh made the following addendum to his opinion:  "Based on my meeting with patient today and my re-review of her records….I offer the following modified opinions…..I think it is better stated that although she did have some pre-existing CCI [craniocervical instability] issues dating back to 2012 they were largely asymptomatic until the collision in question.  I believe that the collision likely represents a 'lighting up' of an asymptomatic pre-existing condition as opposed to an aggravation of an ongoing symptomatic condition.  I believe that the collision has made her symptoms significantly worse and all of her treatments going forward are a direct result of the collision in question."  (COHODAS002905)

The same refinement of position took place with Dr. Grubb, who is one of the few experienced physicians in the world regarding POTS.  His first assessment was in August 2018.  "She was well until 2015 when she suffered a whiplash injury due to a motor vehicle accident where she was a passenger.  Following this she began to develop chronic neck pain, anxiety and fatigue.  Physical therapy actually made the pain worse and afterwards she began to experience daily persistent headache…I concur with her diagnosis of [POTS].  Our current research has suggested that the vast majority of these patients are suffering from a type of autoimmune disorder."  (COHODAS002188)

In his October 7, 2022 declaration, Dr. Grubb clarified his position that Ms. Cohodas's injuries were caused by the April 24, 2015 rear-end collision.  "it is my professional opinion to a reasonable degree of medical certainty that the trauma of the April 24, 2015 motor vehicle collision more probably than not caused an injury to Ms. Cohodas's head and neck, as referenced in her medical records as a whiplash-type concussion….This injury in turn, on a more probable than not basis and to a reasonable degree of medical certainty, triggered and caused an autonomic response in Ms. Cohodas."  (COHODAS003002)

On October 10, 2022 Counsel Paul Smith discussed Ms. Cohodas's pre-trial report with Cindy Davenport.  (CIC001058-1059)  He noted that Ms. Cohodas's experts related her POTS to the accident.  (CIC001058-1059)  He observed that the credentials and experience of Dr. Singh and Dr. Grubb well exceeded the credentials of Dr. Christi Kenyon.  (CIC001058-1059)  He opined that the arbitration panel could make a finding that the value of the claim exceeded the Continental policy limits.  (CIC001058-1059)

13

On October 12, 2022 Ms. Davenport and her manager Mr. Strait reserved the case for policy limits. Ms. Henderson approved the reserve increase to $1 million on October 13. (CIC001058) On October 14, 2022, counsel for Ms. Cohodas was informed that Continental would pay the policy limits.[5] (CIC004059) On October 28, 2022, the limits of $1 million were paid.[6] (PLAINTIFF003030) In my opinion, Continental acted reasonably and in good faith in committing to pay policy limits within one week after receiving information that decisively linked Ms. Cohodas's POTS condition with the rear-end auto accident of April 24, 2015. Regardless of the gaps in communication in the adjustment process, and the failures of defense counsel, there is no indication that Ms. Cohodas's doctors and lawyers could have provided that linkage any sooner than they did.

**CONCLUSION**

In my opinion Continental's overall approach to handling the Cohodas claim for UIM benefits was reasonable. Although some mistakes were made, Continental instituted appropriate claims management, hiring and training practices; issued and regularly updated claims manuals that included industry-compliant timelines; and updated computer systems to track claims. Continental reasonably retained a competent law firm, and reasonably relied on counsel to retain a medical expert to evaluate Ms. Cohodas's symptoms. Within one week of receiving the declarations of Ms. Cohodas's treating physicians that tied her condition to the accident – which her doctors had not previously concluded – Continental reasonably paid the full policy limits.

Procedurally, Continental followed correct practices in its seven years of communications with counsel for Ms. Cohodas, with the exception of certain periods in 2021 during which the claims professional assigned to the case deviated from Continental's required procedures in failing to be responsive to communications from Ms. Cohodas's counsel. Additionally, counsel retained by Continental to represent it in the arbitration failed to perform adequately, and falsely represented to Continental for ten months, through communications and monthly billing statements, that he was appropriately and professionally handling the case. Continental had no knowledge of counsel's misrepresentations until after the commencement of this case and could not have reasonably suspected that its counsel was not performing work as represented.

---

[5] Counsel for Ms. Cohodas insinuates that the current bad faith case, which was filed on October 13, 2022, caused Continental to tender the policy limits. I have not seen any evidence to support this. My experience is that the reserving of the file for policy limits (which took place on October 12) indicates that the limits will be paid.

[6] The check originally was issued on October 19 but had to be reissued. (PLAINTIFF006657)

The foregoing are my opinions in this matter based upon my review of all of the currently available materials in this case.  I reserve the right to further express opinions based on material provided after this opinion and any testimony and documents introduced at trial of this matter.

Regards,

Julia A. Molander
JAMolander Consulting LLC

# Appendix A



Julia A. Molander
Insurance Litigation Expert Consultant
718 23rd Avenue
San Francisco, CA  94121
jamolander@sbcglobal.net
415-860-5725

Julia Molander is a leading consultant and expert witness in complex insurance coverage and bad faith litigation.  She has been retained in dozens of matters as an expert consultant on insurance claims handling and strategic litigation issues, in the United States, Canada and the UK.  She has testified as an expert witness on claims handling in both state and Federal matters.

Prior to her consultancy business, Julia represented clients for more than 40 years in virtually all aspects of the insurance business, including insurance coverage litigation, insurance counseling, crisis management, extra-contractual (bad faith) liability, insurance fraud, underwriting matters, policy drafting, regulatory compliance, brokerage and agency liability, insurance insolvency, reinsurance matters and legislative issues.  She has acquired deep insurance policy knowledge and experience in CGL, excess, D&O, E&O (brokers and agents, lawyers, accountants, architects and engineers), commercial and individual property, food liability, products liability, trucking and transportation, construction, and cyber liability.

During her legal career, Julia has served as first-chair in a number of bench trials, jury trials and arbitrations.  She has reviewed and analyzed thousands of claims files from dozens of insurance companies across the country, as nationally retained counsel in litigated matters, as coverage counsel, and as monitoring counsel in insurance company audit monitoring.  This breadth of claims experience provides her with detailed knowledge as to insurance industry custom, standards, and practices.  She also has participated in insurance company roundtables, and has lectured widely on various aspects of claims handling, bad faith and state regulations (including the NAIC Model Unfair Claims Practices Act, as adopted by many states).  She also is familiar with claims manuals and claims bulletins adopted by insurance companies.  She has been qualified as an expert in numerous courts to testify as to claims handling and duties in malpractice and bad faith cases.  She has engaged in insurance archeology to reconstruct missing policies and insurance charts for long-tail exposures.

Julia was elected a Fellow of the prestigious American College of Coverage Counsel, where she has participated in a number of conference and webinar panels.  She served as the first woman to

1

chair the 1400-member Association of Defense Counsel of Northern California and Nevada (1995 – 1996); she was chair of the California State Bar Insurance Section (2003-2005); she headed the Defense Research Institute's national Insurance Law Committee (2006-2008); she was elected a fellow of the Litigation Counsel of America in 2009. For more than 25 years she has been rated AV Pre-eminent by her peers and has been recognized as a "Super Lawyer" since 2004 and a "Best Lawyer" since 2011. She is one of 14 people in the United States selected from 2007 to present for the International Who's Who in Insurance and Reinsurance law.

Julia has lectured at major professional conferences sponsored by the American Bar Association, Association of Defense Counsel, Defense Research Institute, Association of California Insurance Companies, California Continuing Education of the Bar, the American Conference Institute, the Property Law Research Bureau, the Insurance Risk Management Institute and the Practicing Law Institute. She has published numerous articles and scholarly discussions on a variety of insurance topics. She has served as a contributing author to the California CEB treatise Liability Insurance Practice: Claims and Litigation for more than 20 years, and she previously served as an associate editor of the IRMI CGL Law Reporter for five years.

Education

Northwestern University, BS Communications Studies, with Distinction, 1974
Stanford Law School, Juris Doctor, 1978

Licenses

Admitted to California Bar 1978

Employment

Consolidated Freightways, legal intern, 1975
National Highway Traffic Safety Administration, legal intern, 1976
Law Offices of Ruben Tepper, legal intern, 1977
Bronson, Bronson & McKinnon, 1978 – 1997
Sedgwick, Detert, Moran & Arnold, 1997 – 2011
Meckler, Bulger, Tilson, Marick & Pearson, 2011 – 2015
Cozen O'Connor (by merger with Meckler firm), 2015 – 2019
JAMolander Consulting LLC, 2019 to present

<u>Recently Concluded Expert Retentions</u>

*In Re Arbitration between Wesco and PRISM*

Retained by counsel for PRISM, a California State Joint Powers Authority, in a dispute regarding reinsurance from Wesco for the PRISM program involving 15 self-insured governmental entities. Deposition taken on November 30, 2023 and testimony in arbitration on January 9, 2024.

*Atrium Hilton v. Munich Re, et al.*, Sonoma County Superior Court

Retained by counsel for Munich Re regarding claims handling in dispute over sufficiency of amounts paid for damage to Santa Rosa hotel during 2017 wildfires. Deposition and trial testimony. Case favorably settled during trial in September 2022.

*Restoration Management Co. v. Lee*, San Francisco Superior Court

Retained in December 2021 by counsel for property owner Lee concerning claims handling and bad faith involving payments for damage and repair to restaurant that was damaged by fire. Deposition testimony. Matter resolved during trial.

*Plew v. Auto-Owners Ins. Co.*, Twin Falls, Idaho District Court

Retained in September 2021 by Auto Owners Insurance regarding claims handling and bad faith involving underinsured motorists (UIM) coverage. Deposition testimony. Settled in April 2022.

*Truck Ins. Co. v. Federal Ins. Co.,* Los Angeles Superior Court

Retained in September 2021 by counsel for Federal Insurance Company in dispute between primary and excess carriers concerning settlement of underlying lawsuits for asbestos exposure as a result of allegedly insufficient respirators. Deposition and trial testimony. Trial in May 2023 resulting in decision in favor of Federal.

*Marina Pacific Hotel v. Fireman's Fund Insurance Co.*, Los Angeles Superior Court

Retained by counsel for Fireman's Fund in September 2021 regarding claims handling for large COVID-19 business interruption and bad faith claim. Court ruled for Fireman's Fund on September 2021; case was appealed; appellate court reversed and remanded for trial. Jury verdict in June 2023 for Fireman's Fund on coverage issues. Deposition testimony.

*AV Builders v. Houston Casualty*, San Bernardino Superior Court.

Retained by Houston Casualty in May 2021 regarding claims handling and bad faith involving employment sexual harassment lawsuit. Case dismissed on summary judgment. Deposition testimony.

*Langill v. Allstate Insurance Co.*, USDC Southern District of California

Retained in January 2021 by counsel for Allstate regarding claims handling for first and third party property damage and asbestos remediation claim. Testified at deposition in March 2021. Case dismissed on summary judgment in September 2021.

*Colin and Martinez v. Orozco*, Los Angeles Superior Court

Retained by plaintiffs' counsel in November 2020 regarding claims handling and bad faith involving single car accident which resulted in the death of two people and serious injuries to a third person. Matter resolved in Spring 2023. No testimony.

*Rogachefsky v. Residence Inn*, Los Angeles Superior Court

Retained in October 2020 by plaintiffs' counsel regarding claims handling in multi-party claim regarding long-term mold exposure. Case resolved in December 2021. No testimony.

*Safedocs v. Swett & Crawford*, San Francisco Superior Court

Retained by counsel for insurance brokers Sinclair Insurance Services and Swett & Crawford in 2018 regarding broker liability for insurer's failure to cover loss. Testified at deposition in May 2019. No trial testimony.

*Tod Donobedian v. Kaiser Foundation Health Plan*

Retained by counsel for Kaiser in September 2016 to testify at arbitration regarding interpretation of contractual provisions in Kaiser health policy regarding care outside of Kaiser. Testified at deposition in November 2016 and at arbitration in December 2016.

*Grimberg v. American Alternative Insurance Corporation*, Los Angeles Superior Court

Retained by counsel for Navigators in January 2016 regarding policy cancellation procedures. Testified at deposition in March 2016. No trial testimony.

*Pulte v. American Safety Insurance Company*, San Diego Superior Court

Retained by counsel for American Safety in September 2015 regarding coverage for a developer as an additional insured and application of the ongoing operations endorsement. Testified at deposition in October 2015 and at trial in November 2015.

Recent Publications and Speaking Engagements

"Analyzing Coverage under Recall Policies," Chubb Webinar, March 2019

"The Use and Abuse of Experts in Insurance Litigation," Defense Research Institute's annual Insurance Coverage and Practice Symposium, New York, December 2018

"The Restatement of Law of Liability Insurance and the Impact on Policy Limits Demands," American College of Coverage Counsel Fall Seminar, October 2018

"Driverless Cars – Liability and Insurance, CPCU Society Seminar, Seattle, May 2018

"Independent Counsel Fees: Keeping Control," Property & Liability Research Bureau, Annual Meeting, Orlando, April 2017

"Significant Bad Faith Decisions in 2017," Cozen O'Connor Webinar, February 2018

"Coverage for Intellectual Property Claims," Nationwide Insurance Webinar, January 2018

"Driverless Cars – Liability and Insurance," Cozen O'Connor 2017 Seattle Seminar, September 2017

"Issues in Product Recall Policies," Chubb seminar, New Haven, September 2017

"Eye of the Tiger: Practical Advice in Defending Bad Faith Cases," Defense Research Institute, Bad Faith Symposium, Boston, June 2017

"Mock Trials and *Bull*: Thumbs Up for Jury Consultants," Defense Research Institute, Bad Faith Symposium, Boston, June 2017

"Keeping Your Food Recall Insurance Fresh," American College of Coverage Counsel, Annual Meeting, Chicago, May 2017

"Mediator-Litigator Teamwork," American Bar Association Section of Litigation Annual Meeting, San Francisco, May 2017

"Significant Bad Faith Decisions in 2016," Cozen O'Connor Webinar, March 2017

"New Economy Businesses Need New Insurance: Can the Insurance Industry Keep Up?," American Bar Association Insurance Coverage Litigation Committee Annual Meeting, Tucson, March 2017

"Navigating the Yates Memo Minefield – Directors & Officers Coverage," American College of Coverage Counsel," Spring Symposium, San Francisco, February 2017

"A Game of Thrones – Multi-jurisdictional Battles in Insurance," Defense Research Institute's annual Insurance Coverage and Practice Symposium, New York, December 2016

"Avoid Surprises – Proper Deposition Preparation," AXIS Insurance seminar, Atlanta, April 2016

"Mediation Techniques for Claims Adjusters," Property & Liability Research Bureau National Claims Conference, San Antonio, April 2016

"Do Insurers Have a Duty to Settle even When No firm Demand within Policy Limits Has Been Made?," Cozen O'Connor Webinar, February 2016

"Recent Attacks on Attorney Client and Work Product Privileges in Insurance Bad Faith Lawsuits," Litigation Counsel of America, 2015 Fall Conference and Celebration of Fellows, October 2015

"Latest on Discovery Disputes and Requests:  Claims Files Associated with Institutional Bad Faith, Attorneys as Experts, Erosion of Attorney Client Privilege," American Conference Institute, Chicago, July 2015

"Preserving Privilege in Claims Investigations," Canadian Defence Lawyers Annual Meeting, Toronto, February 2015

"Homeowners Association Coverage," Property & Liability Research Bureau, Minneapolis, September 2014

"Novel Procedural and Substantive Bad Faith Issues: Defense within Limits, Removal, Adjuster Negligence and Personal Liability, Use and Abuse of Social Media," American Conference Institute, Bad Faith Claims & Litigation Institute, San Francisco, July 2014

"Novel Procedural and Substantive Bad Faith Issues:  Eroding Limits Policies, Personal Liability of Adjusters, Removal, and New Social Media Challenges," American Conference Institute, Bad Faith Litigation Symposium, Philadelphia, April 2014

 "The Use of Counsel in Claims Investigations," Defense Research Institute Insurance Coverage and Claims Institute, Chicago, April 2014

 "Attorney-Client Privilege under Attack," American College of Coverage Counsel, Chicago, May 2014

 "Protecting the Attorney Client Privilege," Property and Liability Research Bureau, 2014 Claims Conference, Indianapolis March 2014

"Waiver of Reservation of Rights and Estoppel," American Conference Institute, Bad Faith Litigation Symposium, Orlando, July 2013

 "Avoiding Bad Faith When Litigating Questionable Coverage: Reservations of Rights, Declaratory Judgment Actions, Partially Covered Claims and Additional Insureds," American Conference Institute, Bad Faith Litigation Symposium, Orlando November 2012

 "Twelve Surprising Facts regarding Additional Insured Issues," RLI Insurance Company seminar, Phoenix, May 2012

 "Warning:  Construction Area – Real Life Insurance Challenges," HB Litigation Conferences, Construction Defect and Insurance Leaders' Forum, Santa Monica, March 2012

# **Appendix B**

## INDEX OF DOCUMENTS RELIED UPON

**Produced Documents**

- CIC000001 through CIC007551
- ForUm-CIC_000001 through ForUm-CIC_002033
- PLAINTIFF000001 through PLAINTIFF003097
- Claimant's Prehearing Statement of Proof, dated October 7, 2022, and accompanying records bates numbered COHODAS000001 through COHODAS003011

**Pleadings, Discovery, and Other Documents**

- 2022.12.02 Amended Complaint
- 2022.12.21 Answer to Amended Complaint
- 2022.12.22 Defendant's Initial Disclosures
- 2023.05.31 Defendant The Continental Ins Co's Supplemental Responses to Plaintiff's First Set of ROGs
- 2023.08.18 Plaintiff's First Supplemental Disclosures
- 2023.06.14 Defendant The Continental Insurance Co's Responses to Plaintiffs RFA
- 2023.06.14 Defendant The Continental Insurance Co's Responses to Plaintiffs Second Set of ROGs and RFPs
- 2023.08.17 Def's First RFPs to Pltf and Responses Thereto 4859-0225-5475 v.2
- 2023.08.17 Def's First ROGs to Pltf and Plaintiffs Responses Thereto 4891-3080-4600 v.2
- 2023.10.12 Defendant's Motion for Partial Summary Judgment
- 2023.10.30 Response, by Plaintiff Samantha Cohodas, to Motion for Summary Judgment
- 2023.10.30 Declaration of Kari I. Lester filed by Plaintiff Samantha Cohodas re Motion for Summary Judgment
- 2023.10.30 Declaration of Mary E. Owen filed by Plaintiff Samantha Cohodas re Motion for Summary Judgment
- 2023.11.03 Reply in Support of Motion for Summary Judgment by Defendant The Continental Insurance Company
- 2024.02.14 Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment
- 2024.02.28 Motion for Reconsideration of the Court's February 14, 2024 Order and Motion for Certification

**<u>Deposition Transcripts</u>**

- 2023.11.01 Deposition of Samantha Cohodas
- 2023.12.12 Deposition of Cindy Davenport
- 2024.01.25 Deposition of Heather Henderson
- 2024.01.31 Deposition of 30(b)(6) Representative and Walter Strait
- 2024.02.08 Deposition of Paul Smith
- 2024.02.09 Deposition of Brad Barton
- 2024.02.26 Deposition of Brian Rawlins